

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-1999

# Iadimarco v. Runyon

Precedential or Non-Precedential:

Docket 98-5150

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Iadimarco v. Runyon" (1999). *1999 Decisions.* Paper 251.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/251

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 8, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

NO. 98-5150

CHARLES A. IADIMARCO,

Appellant

v.

MARVIN T. RUNYON, POSTMASTER GENERAL

On Appeal from the United States District Court for the District of New Jersey D.C. Civil No. 95-cv-05873 District
Judge: Hon. Garrett E. Brown, Jr.

Argued: February 9, 1999

Before: Becker, Chief Judge, McKee, Circuit Judges Lee, District Judge*

(Filed September 8, 1999)

Robert W. Beattie, Esq. (Argued) Beattie & Murray 800 Riverview Dr., Suite 103 Brielle, NJ 08730

Attorney for Appellant

_____

*The Honorable Donald J. Lee, United States District Judge for the Western District of Pennsylvania, sitting by designation.

Dorothy J. Donnelly, Esq. (Argued) Office of United States Attorney 402 East State Street Room 502 Trenton, NJ 08608

Attorney for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to review the District Court's grant of summary judgment in favor of the United States Postal Service, and against its employee, Charles Iadimarco. Iadimarco filed an action under Title VII of the 1964 Civil Rights Act alleging "reverse discrimination" after he was denied a requested promotion within the Postal Service. The District Court ruled that Iadimarco had not established a prima facie case of illegal discrimination. The court also ruled in the alternative that,

assuming Iadimarco had established a prima facie case, he had not rebutted the defendant's
race-neutral explanation for the challenged employment decision. For the reasons that follow, we hold that Iadimarco established a prima facie case under Title VII. We also hold that he produced sufficient evidence to raise a genuine issue of material fact as to whether the defendant's explanation was a pretext for illegal discrimination. Accordingly, we will reverse and remand for further proceedings consistent with this opinion.

I. Factual and Procedural Background

In 1992, the Postal Service undertook a national reorganization in which many jobs were consolidated or eliminated. After the reorganization, managerial employees were informed that they had to submit a "991 form" to indicate their preferences for available jobs. Employees could apply for positions as long as they were within six EAS levels for processing and distribution positions. Charles Iadimarco, a White male, submitted a 991 form indicating his preference for three positions: Manager of In-plant Support at Kilmer (EAS 21), Manager of In-plant Support at Trenton (EAS 21), and Manager of In-plant Support at Monmouth (EAS 19).

After the Kilmer and Trenton jobs were filled by White males, Iadimarco contacted Robert Towler, the selecting
official for Monmouth, about the Monmouth position. Towler had rated each of the 41 applicants for the Monmouth
position according to a "knowledge, skills and abilities" matrix ("KSA") that was part of the applicants' 991 form.1
Iadimarco was one of only three candidates for the Monmouth position who received a rating of "superior" in every
KSA category.

The District Court found that Towler interviewed Iadimarco for the Monmouth position in March 1993, though the
issue was disputed. In any event, Iadimarco claims that Towler told him that he (Iadimarco) would be selected for the position pending approval of Henry Pankey, Towler's supervisor. However, on March 25, 1993, and again on April 1, 1993, Towler requested permission to re- post the Monmouth position. At trial, Towler testified that the other two top candidates for the Monmouth position had been placed in other positions before the Monmouth position could be filled, and he did not think that Iadimarco should be promoted by "default." According to Towler, he therefore re-posted the position rather than merely hiring Iadimarco who was then the only applicant remaining who had received a superior rating in every KSA category. Iadimarco alleges that Towler re-posted the

_____

1. The KSAs for the position were the ability to:

(1) manage the implementation of national and area processing and distribution programs and policies.

(2) manage the review and evaluation of local operations.

(3) manage the development of local requirements for resources.

(4) resolve issues with customers, major mailers, and suppliers.

(5) provide technical support to post offices.

(6) manage the work of people to meet organization goals, including organizing and structuring the work, establishing effective work relationships, and facilitating the flow of work-related information. Dist. Ct. Op. at 2.

_____

position because Towler was having difficulty getting Iadimarco's name past Pankey. Iadimarco's contention is based upon his belief that Pankey wanted to hire a minority applicant for the Monmouth position to diversify the work place.2 Iadimarco's assertion is based in large part upon a memorandum that Pankey issued to all plant managers and installation heads in December of 1992 (the "diversity memo"). The memo stated:

As we proceed to fill vacancies, I want to ensure that very serious consideration is given to the issue of diversity – I cannot emphasize this point more strongly. The management teams in our plants should reflect the composition of our workforce and communities if we are to benefit from the contributions that minorities, women, and ethnic groups can bring to our decision making processes and the social harmony that this will instill in our work environment.

Your personal commitment is needed –- if there are any questions on this matter, please feel free to contact me.
Although Pankey admitted signing this memo, he denied writing it.

On or about March 25, 1993, Iadimarco and Towler discussed placing Iadimarco into the position of Operations
Support Specialist (EAS 16) in the Monmouth facility. Iadimarco claims that he did not accept the position, but Towler testified that Iadimarco did accept it. Nonetheless, it is undisputed that Iadimarco did accept the position of Operations Support Specialist in the Trenton facility in early March or April. Thereafter, Toni Williams, a Black female, was promoted to Acting In-plant Support Manager for the Monmouth facility. Towler formally announced Ms. Williams' selection as the In-plant Support Manager approximately two weeks later.

On May 28, 1993, Iadimarco initiated a proceeding before the Equal Employment Opportunity Commission because
_____
2. The majority of managers at the relevant level are White males. A197.
_____

he believed that he had been denied the Monmouth position because he is a White male. The complaint was eventually heard by an Administrative Law Judge who agreed that Iadimarco had been the victim of illegal race and gender discrimination. However, the ALJ's findings were rejected by the EEOC. The agency concluded that plaintiff failed to establish a prima facie case of discrimination because he had accepted another position before being denied the In-plant Manager position at Monmouth. Iadimarco

then filed a complaint in the United States District Court for the District of New Jersey alleging illegal racial discrimination under Title VII of the 1964 Civil Rights Act. Following discovery, the District Court granted summary judgment in favor of the Postal Service and against Iadimarco. This appeal followed.3

II. Discussion

A. The District Court's Decision.

The District Court concluded that it had to apply the ever-present burden-shifting analysis announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In conducting that analysis, the District Court noted a split among the courts of appeals in "reverse discrimination" cases as to the prerequisites of a prima facie case required of a White male. See Dist. Ct. Op. at 5, n.2, and cases cited therein. The court stated that although "the Third Circuit has yet to address this issue, most of the [district] courts in this Circuit have required plaintiffs to first establish background circumstances that support an inference that the defendant employer is "the unusual employer who discriminates against the majority." Id.

_____

3. The District Court had jurisdiction pursuant to 42 U.S.C. § 2000e et seq. We have jurisdiction pursuant to 28 U.S.C.§ 1291. Our review is plenary. Waldron v. SL Industries, Inc., 56 F.3d 491, 496 (3d Cir. 1995). See also Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 501 (3d Cir. 1996) (citing Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)). We "must view the evidence in the light most favorable to the nonmovant, giving that party the benefit of all reasonable inferences derived from the evidence." Waldron, 56 F.3d at 496 (citing Torre v. Casio Inc., 42 F.3d 825, 830 (3d Cir. 1994)).

_____

(quoting Wallick v. AT & T Communications Inc. , 1991 WL 635610 at *6 (D.N.J. 1991) ("Although Title VII .. . prohibits discrimination against a majority group,`it makes little sense, within the historical context of the Act, to infer discrimination against [the majority] in the same way that discrimination is inferred against [minorities].' ")). The District Court quoted Harding v. Gray, 9 F.3d 150 (D.C. Cir. 1993), in observing that evidence of "background circumstances" "can be divided into two general categories: (1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against [W]hites, . . . . and (2) evidence indicating that there is something `fishy' about the facts of the case at hand that raises an inference of discrimination." Harding, 9 F.3d at 153.4

The District Court then held that Iadimarco did not "sustain his burden of showing the requisite background circumstances," Dist. Ct. Op. at 6, under Harding. The court held that "plaintiff has failed to present any evidence to show that he was more qualified than Williams." Id. at 7. In reaching that conclusion, the court rejected Iadimarco's

request that it examine the job applications of the two competing candidates and find that he was more qualified than Williams. The court stated "[p]laintiff does not . . . explain . . . how his application exhibits that he has `superior qualifications than Williams.' Moreover, from examining the applications, this Court is unable to determine that plaintiff had `superior qualifications.' " Id.5

_____

4. In Harding, the court clarified that the "[b]ackground circumstances need not mean `some circumstances in the employer's background.' " Id. Rather, the court merely required a plaintiff who was not a member of a "historically disfavored" group to present evidence of circumstances that would support a finding that the challenged actions were motivated by racial animus.

5. Iadimarco did present evidence that the Trenton plant manager, Stuart Gossoff, who eventually hired Iadimarco, felt that the latter's qualifications were superior to Williams'. However, the District Court concluded that Gossoff 's opinion was irrelevant because he was not involved in the decision to hire the In-plant Manager in Monmouth. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992).

_____

The District Court reasoned that the mere fact that both Pankey and Towler were Black was "insufficient to show background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against the majority." Dist. Ct. Op. at 8. We agree that the race of the selecting officials is not a sufficient circumstance to establish a prima facie case of discrimination by itself. Although the race and/or gender of the individual(s) responsible for a hiring decision is certainly relevant, it is insufficient to establish a prima facie case of discrimination without more.

In holding that Iadimarco had not presented any evidence of discrimination other than the race of Pankey and Towler, the District Court rejected Iadimarco's assertion that the diversity memo was a "smoking gun." See Appellee's Br. at 22. The District Court held that the memo was "insufficient to create the suspicion that the requisite background circumstances existed" under Harding because the memo did nothing more than restate policy enunciated in the Civil Service Reform Act. Dist. Ct. Op. at 10. See also 5 C.F.R. § 720 App. to Pt. 720 at 13 ("The [Civil Service Reform Act of 1978] establishes in law as the first merit principle that recruitment should be designed to achieve a Federal workforce from `all segments of society.' ").

The court also held that, assuming arguendo that Iadimarco's evidence was sufficient to establish a prima facie case, he had not presented sufficient evidence to allow a reasonable fact finder to conclude that the employer's justification for hiring Williams was a pretext for illegal discrimination. The court accepted Towler's explanation that he hired Williams because she was "the right person for the job." Dist. Ct. Op. at 14. In doing so, the court relied in part upon the following exchange from Towler's deposition:

Toni Williams seemed to be right for the plant at the time. She offered a fresh approach to the work room floor. She offered a fresh approach to the employees out there . . . I am not viewed as the gentlest person around. . . .

The In-Plant was meant to be a buffer. The Manager In-Plant was meant to access those people on the work room floor with the problems that they were having. . . . A person that had the ability to interface with people. Had no problem in what operations were out there on the work room floor.

Q: You don't think Mr. Iadimarco had these qualities?

A: I could not recall Mr. Iadimarco having exhibited those qualities when he was here in Monmouth.

Dist. Ct. Op. at 15.

The District Court correctly noted that we have not yet decided upon the proper expression of a prima facie case in "reverse discrimination" cases. Accordingly, we take this opportunity to provide guidance for the trial courts in this
Circuit.

B. The Prima Facie Case in "Reverse Discrimination"

Suits Under Title VII.

42 U.S.C. Section 2000e-2 states that:
(a) Employer Practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2 (West 1997).

The Supreme Court has recognized that an employer who discriminates will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent. Accordingly, the Court  fashioned the McDonnell Douglas burden-shifting analysis to allow plaintiffs to proceed without direct proof of illegal discrimination where circumstances are such that common sense and social context suggest that discrimination has occurred. In the "ordinary case" where a minority plaintiff alleges race-based employment discrimination, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination . . . . by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from

persons of complainant's qualifications." McDonnell Douglas, 411 U.S. at 802.

Once the plaintiff establishes a prima facie case,"the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. at 802. However, "the defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). For purposes of defeating a plaintiff 's motion for summary judgment, "[i]t is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254. If the employer offers some evidence of a legitimate, nondiscriminatory reason then plaintiff must "be afforded a fair opportunity to show that [employer's] stated reason for [plaintiff 's] rejection was in fact pretext." McDonnell Douglas, 411 U.S. at 804. "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff 's rejection." Burdine, 450 U.S.  at 253–54.

Inasmuch as the first prong of this test requires plaintiff to establish his or her identity as a member of a minority group, the literal application of the test would preclude its use by White plaintiffs alleging "reverse discrimination." In fact, the historical context of Title VII allowed for some debate as to whether Congress intended to extend its reach to practices that have come to be known as "reverse discrimination." However, in McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1976), Justice Marshall, writing for a unanimous Court, stated: "[t]he Act prohibits All racial discrimination in employment, without exception for any group of particular employees. . . ." Thus, it is now clear that the dictates of Title VII "are not limited to discrimination against members of any particular race [and Title VII] proscribe[s] racial discrimination in private employment against [W]hites on the same terms as racial discrimination against nonwhites." Id. at 278–79, 280. No doubt because of this country's history of race relations, most Title VII plaintiffs have been members of a minority group, and the first prong of the McDonnell Douglas test was stated in the context of that history.

The premise underlying the varied McDonnell Douglas standards remains unchanged. It stems from Congressional efforts to address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect.

Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985). However, the holding of Santa Fe Trail as well as the language of McDonnell Douglas itself clearly establishes that the substance of the burden-shifting analysis applies with equal force to claims of "reverse discrimination."

Nevertheless, courts have struggled in attempting to apply the McDonnell Douglas burden-shifting framework to Title VII suits by White plaintiffs, and no universally accepted statement of the appropriate standard has emerged. The confusion arises from the wording of the very first prong of

the McDonnell Douglas test. Obviously, a White plaintiff can not establish "membership in a minority group" in the same way a Black plaintiff can. In an effort to "cram"6 the "reverse discrimination" cases into the McDonnell Douglas framework, most courts of appeals that have considered the issue require White plaintiffs to present evidence of "background circumstances" that establish that the defendant is "that unusual employer who discriminates against the majority," Parker v. Baltimore & O. R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981), instead of showing minority group status. In Parker, the court

_____

6. See Eastridge v. Rhode Island College, 996 F. Supp. 161, 167 (D. R.I., 1998) ("attempting to cram a reverse discrimination case into the McDonnell Douglas framework is not a reasonable approach. . . ."); Cully v. Milliman & Robertson, Inc., 20 F. Supp. 2d 636, 641 (S.D.N.Y., 1998) (same).

_____

explained the rationale for adopting that change to the traditional McDonnell Douglas prima facie case:

The original McDonnell Douglas standard required the plaintiff to show "that he belongs to a racial minority."
Membership in a socially disfavored group was the assumption on which the entire McDonnell Douglas analysis was predicated, for only in that context can it be stated as a general rule that the `light of common experience' would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a Black employee justifies an inference of prejudice against White co-workers in our present society.
Parker, 652 F.2d at 1017. After Parker was decided, the Court of Appeals for the D.C. Circuit amplified its "background circumstances" modification of McDonnell Douglas. The court stated:

The evidence that this Court has found in the past to constitute "background circumstances" can be divided into two categories: (1) evidence indicating the particular employer . . . has some reason or inclination to discriminate invidiously against whites, and (2) evidence indicating that there is something "fishy" about the facts of the case at hand that raises an inference of discrimination.

Harding, at 153. The court also cautioned that " `background circumstances' need not mean`some circumstances in the employer's background.' " Rather, the court noted "[o]n the contrary, other evidence about the `background' of the case at hand -- including an allegation of superior qualifications -- can be equally valuable." Id. The court also insisted that the "background circumstances" test "is not an additional hurdle for white plaintiffs," and asserted that it was merely"a faithful transposition of the McDonnell Douglas/Burdine test . . ." into the context of "reverse discrimination." Id. at 154.

Despite that clarification, some courts have concluded that substituting "background circumstances" for the first prong of McDonnell Douglas does raise the bar, and those courts have rejected the Parker/Harding analysis

for that reason.  For example, in Eastridge, the court concluded that the Parker/Harding test "require[s] a reverse discrimination plaintiff to show that the specific employer has displayed a pattern of discrimination against the majority in the past [and therefore] imposes a more onerous burden on such a plaintiff as compared to any plaintiff from any protected group." 996 F.Supp. at 161. See also Ulrich v. Exxon Co., 824 F.Supp. 677, 683-4 (S.D. Tex. 1993) (describing the "background circumstances" test as imposing a"heightened burden" and citing cases that have criticized it). In Cully v. Robertson, Inc., 20 F.Supp. 2d 636, 641 (S.D.N.Y., 1998), the court invited a comparison between Parker and Lucas v. Dole, 835 F.2d 532 (4th Cir. 1987), and described the former as requiring a "higher prima facie burden for reverse discrimination plaintiffs" and the latter as having "no higher prima facie burden." In Collins v. School District of Kansas City, 727 F.Supp. 1318, 1320 (W.D. Mo., 1990), the court concluded that the "background circumstances" test required a "special showing" of White Plaintiffs, and rejected the test for that reason. The court also concluded that the "unusual employer" prong of Parker established an "arbitrary barrier which serves only to frustrate those who have legitimate Title VII claims." Although the Court of Appeals for the Eighth Circuit had not yet spoken on the issue, the court in Collins relied upon Loeffler v. Carlin, 780 F.2d 1365, 1369 (8th Cir. 1985) to reason that the court of appeals would also decline to follow the Parker line of cases. In Loeffler, the court concluded that a male plaintiff had established a prima facie case in a gender discrimination suit without showing any background circumstances to suggest that the defendant was the "unusual employer who discriminates against the majority." The Collins court reasoned that the Court of Appeals for the Eighth Circuit would not, therefore, adopt the heightened burden the district court believed was endemic in the "background circumstances" inquiry. However, when the Court of Appeals was finally called upon to address the issue of the appropriate prima facie standard required in "reverse discrimination" cases, it did adopt the Parker/ Harding requirement of "background circumstances." See Duffy v. Wolle, 123 F.3d 1026 (8th Cir. 1997). In Duffy, the court had to decide if a White male plaintiff who had alleged gender discrimination in the context of a Bivens action7 had established a prima facie case. The plaintiff was precluded from bringing a Title VII action by statute8 but the court used a McDonnell Douglas analysis in analyzing the applicable burdens in the context of a Bivens claim. In doing so, the court relied heavily upon the Parker line of cases. The court concluded that the plaintiff had presented evidence of at least three "background circumstances [to] support the suspicion that [the defendant] was that unusual employer who discriminates against the majority." Id. at 1037 (internal quotation marks omitted).

The "background circumstances" test has been adopted by the respective circuit court of appeals in each of the
following cases: Mills v. Health Care Serv. Corp., 171 F.3d 450, 457 (7th Cir. 1999); Duffy, 123 F.3d at 1036-37;
Reynolds v. School Dist. No. 1, 69 F.3d 1523, 1534 (10th Cir. 1995); Notari v. Denver Water Dept., 971 F.2d 585
(10th Cir. 1992); and Murray, 770 F.2d at 66-67. However, application and interpretation of the test has often proven difficult. In addition to the concerns expressed by the aforementioned district courts, the Court of Appeals for the Sixth Circuit has gone so far as to question its earlier

adoption of the test. In Murray, the district court had relied upon Parker in concluding that the White plaintiff had failed to show the required "background circumstances" necessary to establish his prima facie case under McDonnell Douglas. On appeal, the Court of Appeals for the Sixth Circuit had stated: "[w]e agree with the district court that a prima facie case of `reverse discrimination' is established upon a showing that `background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority'[.]" 770 F.2d at 67 (citing Parker). However, nine years later in Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994), the same court noted that the "background circumstances" test had been criticized for imposing a "heightened standard," on White plaintiffs.

---

7. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

8. See 42 U.S.C. § 2000e–16.

---

The court then stated: "[w]e have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are [W]hite or male than for their non-[W]hite or female counterparts." Pierce, 40 F.3d at 801 n. 7. However, the Pierce court did not have to resolve the obvious tension between that pronouncement and Murray's adoption of that test, because the plaintiff in Pierce could not meet the second prong of the McDonnell Douglas test.

Here, as stated above, the District Court substituted the "background circumstances" requirement for the minority group status otherwise required under the first prong of the McDonnell Douglas test. We now reject the"background circumstances" analysis set forth in Parker , Harding, and their progeny.

The prima facie case under McDonnell Douglas merely states "the basic allocation of burdens and order of presentation of proof [under] Title VII. . ." Burdine, 450 U.S. at 252 (1980). It raises an inference of discrimination
only because we presume these acts, if otherwise unexplained in the context of the prongs of the McDonnell Douglas prima facie case, are more likely than not based on the consideration of impermissible factors. See Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978). However, "[t]he central focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." Id. (internal quotation marks omitted).

Accordingly, all that should be required to establish a prima facie case in the context of "reverse discrimination" is  for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII.

The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. In other words, is the

employer treating some people less favorably than others because of their race, color, religion, sex, or national origin. The prima facie case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.

U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). Stating the prima facie case in terms of "background circumstances" and the uniqueness of the particular employer is both problematic and unnecessary. As noted above, many of the courts that have tried to apply such an analysis have concluded that it results in a heightened burden for the plaintiff despite the aforementioned proclamations to the contrary by the court that developed the test.9
The pronouncement in Harding that the analysis there did not heighten the plaintiff's burden has not convinced several of the district courts that have had to determine the appropriate analysis.

Moreover, the suggestion that a plaintiff must prove "background circumstances" to establish that the defendant is a "unique employer that discriminates against the majority" has a tendency to force the plaintiff to initially present proof that would otherwise only become relevant to rebut the employer's explanation of the challenged conduct. As noted above, in Harding, the court defined "background circumstances" to include: "(1) evidence indicating that the  particular employer at issue has some reason or inclination to discriminate invidiously against whites, . . . and (2) evidence indicating that there is something `fishy' about the facts of the case at hand that raises an inference of discrimination." Harding, 9 F.3d at 153. The court further stated that the "background circumstances" test requires a member of a majority group to proffer evidence that the challenged actions were motivated by racial animus. But this is the underlying inquiry in any Title VII case. Thus, the Parker/Harding modification can undermine the basic point of the McDonnell Douglas burden-shifting regime to make it easier for employees to bring claims that would otherwise be extraordinarily difficult to prove. The Supreme Court imposed the burden-shifting test to eliminate early on some of the most common nondiscriminatory reasons for employment decisions, as well as to place

---

9. See Harding, 9 F.3d at 154.

---

the burden of production on the party with the most access to the employer's decision making process, i.e., the employer itself. Parker, Harding, and their progeny go too far in amending the prima facie case to include allegations of reverse discrimination.

Moreover, to the extent it might be argued that Harding does not go as far as we suggest, we believe that the concept of "background circumstances" is irremediably vague and ill-defined. For example, one of the alleged background circumstances here is that Iadimarco was more qualified than Williams. That can hardly be termed a "background circumstance," unless that term is defined to include anything that suggests discrimination. Indeed, some courts have proclaimed their adoption of the "background

circumstances" requirement as suggested by Parker and Harding, but have further modified that test in a manner that renders the test itself absolutely unnecessary. For example, in Notari, 971 F.2d 585 (10th Cir. 1992), the court stated:

we agree that a Title VII disparate treatment plaintiff who pursues a reverse discrimination claim, and seeks to  obtain the benefit of the McDonnell Douglas presumption, must, in lieu of showing he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.
971 F.2d at 589.

However, the court then held that such a plaintiff could also establish a prima facie case by direct evidence, or by indirect evidence that supported afinding of discriminatory intent.

We adopt the set of prima facie case alternatives that the Fourth Circuit has outlined. Thus, a plaintiff who presents direct evidence of discrimination or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff 's status the challenged employment decision would have favored the plaintiff states a prima facie case of intentional discrimination under Title VII. Id., at 590 (emphasis added). However, it is obvious that this alternative method of indirect proof negates the need to ever present evidence of "background circumstances." All that will ever be required of a White-male plaintiff under this test is that he present sufficient evidence to support the reasonable probability of discrimination. There is no need to embark upon the problematic detour of showing "background circumstances."

The "Fourth Circuit" case referred to in Notari is Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). Holmes involved a Title VII suit by a Black plaintiff who alleged that he was denied a promotion based upon his race. After the defendant employer selected a White applicant tofill the vacant position, the vacancy ceased to exist, and  Holmes could therefore not establish that the position remained open after his rejection as required by the fourth  prong of the McDonnell Douglas analysis. Recognizing the practical problem created by requiring a minority plaintiff in Holmes' position to establish a continuing vacancy, the court made a common sense adjustment to the fourth prong and simply required plaintiff to present "some other evidence that his race was a factor considered by his employer in not granting him the promotion." In adopting this substituted inquiry the court stated: "[t]here must be some evidence that race was a determining factor in the employer's decision." Holmes, 794 F. 2d at 147. Prior to focusing on the problem presented by the original formulation of the McDonnell Dougas inquiry, the court had stated:

This is a disparate treatment case, and a prima facie case may be established by direct evidence of discrimination or
by indirect evidence whose cumulative probative force, apart from the presumption's operation, would suffice under
the controlling standard to support as a reasonable probability the inference that but for the plaintiff 's race he would

have been promoted. Without such evidence, the claimant must resort to the McDonnell Douglas presumption with all of its ensuing complexities.
794 F.2d at 146 (footnote omitted).

The court in Notari used this statement of a methodology of proof under the McDonnell Douglas analysis, and then incorporated it into the McDonnell Douglas analysis it employed to fill the interstices left by the "background circumstances" inquiry it had adopted.

Moreover, one might contend that a "background 960<!>circumstance" must be something in the employer's background. Such a requirement does raise the bar for the prospective "reverse discrimination" plaintiff, notwithstanding the denial of this limitation in Harding. Moreover, a review of cases addressing this issue illustrates that it is difficult, if not impossible, to come up with a definition of "background circumstances" that is clear, neither under- nor over inclusive, and possible to satisfy. In Stock v. Universal Foods Corp., 817 F.Supp. 1300 (D. Md. 1993), the court replaced the "background circumstances" requirement with the requirement that plaintiff establish "he belongs to a class." 817 F.Supp. at 1306. In Wilson v. Bailey, 934 F.2d, 304 (11th Cir. 1991), the court also stated Title VII requires a White plaintiff to establish that "he belongs to a class" as the first step in establishing a prima facie case under McDonnell Douglas. However, neither court further defined the "class" to which it was referring. The discussion in Stock and Wilson illustrate just how vague and problematic the Parker/Harding approach can be. Inasmuch as everyone belongs to some "class," substituting membership in an undefined class for membership in a minority group is tantamount to eliminating the first prong of the McDonnell Douglas framework sub silentio.

Moreover, the amorphous nature of "background circumstances" can lead to jury confusion. The Title VII plaintiff needs only to present sufficient evidence to allow a fact finder to conclude that the unexplained decision that forms the basis of the allegation of discrimination was motivated by discriminatory animus. It is at the pretext stage that "background circumstances" would normally be introduced. Courts struggling with "cramming" the "background circumstances" inquiry into thefirst prong of McDonnell Douglas may well require "pretextual" evidence as part of the plaintiff 's initial evidence. Such evidence may be relevant to the "background circumstances" surrounding the claim of discrimination or to a finding that defendant is an employer that is likely to discriminate. The result is the "heightened burden" many district courts have criticized and that Harding disclaimed.

Accordingly, rather than require "background circumstances" about the uniqueness of the defendant employer, a plaintiff who brings a "reverse discrimination" suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff"less favorably than others because of [his] race, color, religion, sex, or national origin." Furnco, 438 U.S. at 577. With this standard in mind, we turn to the evidence Iadimarco presented to support his Title VII claim.10

_____

10. Judge McKee believes that the approach set forth in Parker and Harding is merely a restatement of the McDonnell Douglas test just as the Court of Appeals for the D.C. Circuit intended it to be. He concludes that "[I]nvidious discrimination against[W]hite [men] is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision to promote a qualified minority [or female] applicant instead of a qualified [W]hite[male] applicant." Harding, 9 F.3d at 153. In his view, requiring a White male plaintiff to show certain "background circumstances" merely requires that plaintiff to present some evidence from which a reasonable fact finder could conclude that it is more likely than not that the unfavorable employment decision is the result of discriminatory animus. Judge McKee's belief is based in part upon Livingston v. Roadway Exp., Inc., 802 F.2d 1250, 1252 (10th Cir. 1986), set forth above, wherein the court explained:

the presumptions in the Title VII analysis that are valid when the plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group. Accordingly, when a plaintiff who is a member of a favored group alleges disparate treatment, the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminated against the majority.

Accordingly, Judge McKee concludes that the Court of Appeals for the D.C. Circuit is correct in stating that the "background circumstances" test "is not an additional hurdle for [W]hite plaintiffs." Harding, 9 F.3d at 154. He agrees with that court's belief that the test is merely "a faithful transposition of the McDonnell Douglas /Burdine test . . ." into the context of "reverse discrimination," Id. at 154, so long as the analysis of "background circumstances" and the "uniqueness" of the employer is undertaken in the manner intended by the Court of Appeals for the D.C. Circuit.

However, even though Judge McKee believes the test to merely be a restatement of McDonnell Douglas, he concedes that it is just too vague and too prone to misinterpretation and confusion to apply fairly and consistently. He agrees that the approach the court adopts today allows for less confusion and more consistency than the Parker/Harding approach.

_____


1. Iadimarco's Evidence of Discrimination

As noted above, Ms. Williams, a Black female, was given the position Iadimarco applied for. It is undisputed that Iadimarco had received a ranking of "superior" in each KSA category, and that he was the only candidate to be so ranked when the Monmouth position was filled. Williams never received nor requested a KSA rating. As we also noted above, Towler based his failure to hire Iadimarco on the fact that the other two

candidates who received a "superior" KSA rating had already taken other positions and he (Towler) did not want to simply promote Iadimarco by default. Although that may be true, the fact that Towler then offered the position to someone who had no KSA rating at all certainly raises suspicions. Towler did not simply recruit more applicants to compete with Iadimarco. Rather, he recruited an additional applicant who wasn't even evaluated using the KSA matrix. Moreover, Williams' application was submitted after the deadline for applications had passed. In addition, Iadimarco had previously been In-Plant manager in Trenton, and therefore had experience as an In-Plant manager. Williams did not.

Most importantly, however, Iadimarco argues that he was told that an engineering background was a prerequisite for the position of In-Plant Manager at Monmouth. He had an engineering degree, and he alleges Williams did not have one. Thus, although the employer may well have had legitimate reasons for subsequently focusing on the applicant's human relations skills, this does not explain why the initial focus on engineering backgrounds was abandoned as  Williams' candidacy emerged

Additionally, we must view these circumstances in light of Pankey's diversity memo. In doing so, we caution that the memo is not, in and of itself, sufficient to establish a prima facie case of illegal discrimination. An employer has every right to be concerned with the diversity of its workforce, and the work environment. Here, however, we must draw all inferences in favor of Iadimarco, the nonmovant for summary judgment. In doing so, we assume that Pankey did write the memo that he signed and distributed even though he subsequently attempted to distance himself from it. As noted above, Pankey admitted that he signed the memo, but stated that it was nothing more than a "carbon copy" of a memo he had received from headquarters. However, defendants were unable to produce any such memo from headquarters. A reasonable fact finder could conclude that Pankey was not credible, and that his attempt to deny authorship of the memo was consistent with Iadimarco's allegations of bias.

A reasonable fact finder could also find Towler's denial that he had interviewed Iadimarco significant. Towler originally conceded that Iadimarco had been interviewed for the position, but later denied that any interview had occurred. Rather, he dismissed his discussion with Iadimarco by asserting that it was merely a "conversation."[11] In Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997), the employer denied interviewing the plaintiff/applicant, but we held that conflicting evidence about the existence of an interview created a genuine issue of material fact. See id. at 992

---

11. Q: Okay. The conversation that you had with him, was it a direct result of him asking you could he come up to talk to you about the job?

A: Yes.

Q: Was it your own opinion to interview him for the job?

A:  I can't say it was an interview. We had a conversation referencing that particular position.

The Court: Face-to-face conversation?

The Witness: A face-to-face conversation.

App. at 83HH (Towler's testimony).

_____

("there is no testimony to support either conjecture, and, even if there were, it would be up to a jury to reconcile the conflicting testimony surrounding [plaintiff's] interview and the ranking of candidates.").

Here, the District Court thought it significant that, except for Williams, all of the supervisors that Towler hired were White. See Dist. Ct. at 8-9; App. at A197 (noting that "out of the twenty-seven plant managers hired, 74% of them were [W]hite males."). The District Court reasoned that this suggested that Towler did not discriminate against Whites who applied to be supervisors. However, the inquiry is not whether Towler and/or Pankey discriminated against Whites in general, but whether they illegally discriminated against Iadimarco.

A fact finder clearly could look at the number of White supervisors Towler had hired and conclude that it suggested that he treated Iadimarco fairly. However, a fact finder could also conclude that Towler tried to manipulate the process to hire Williams because he had already hired many White supervisors. We cite this evidence not to suggest our view of it, but because it shows that there are disputed issues of material fact.12 "Summary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." Bray, 110 F.3d at 990 (citations and internal quotation marks omitted). "A dispute regarding a material fact is genuine `if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Josey, 996 F.2d at 637 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c)).

The Postal Service has argued that Iadimarco's claim must fail because he accepted another job before Williams was hired. That argument is based on Iadimarco's acceptance of the position of Operations Support Specialist in the Trenton facility in early March or April 1993. See Dist. Ct. Op. at 3. Iadimarco counters by explaining that he

_____

12. Nor do we mean to infer that Iadimarco was more or less qualified than Williams. We take no position as to the respective qualifications of those two employees. only accepted the other position because it was becoming clear to him that Pankey wanted to fill the In-Plant Manager position with Williams.

It defies all logic to hold that an alleged victim of discrimination is precluded from recovering damages under Title VII merely because he or she accepted another position after concluding that racial bias would govern the challenged hiring decision. If that were the law, an employer could

freely discriminate by dillydallying until the discrimination victim was forced to take another position. The employer could then insulate itself from its discriminatory animus, and reap the fruits of its bias merely by arguing that the applicant had removed himself or herself from consideration. That would protect and reward the unscrupulous employer willing to delay ultimate hiring decisions in order to force the unwanted applicant to look elsewhere. Accordingly, we hold that the District Court erred in ruling that Iadimarco failed to establish a prima facie case of illegal race discrimination under Title VII.

However, that conclusion does not end our inquiry. The District Court ruled that even if Iadimarco had established a prima facie case, the Postal Service presented a race- neutral explanation for its decision to hire a Black female, and Iadimarco had not met his burden of presenting sufficient evidence of pretext to rebut it. Accordingly, we will examine what, if any, evidence of pretext Iadimarco presented.

2. Pretext

"[T]o defeat summary judgment when the defendant answers the plaintiff 's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (emphasis added). However, "if the plaintiff has pointed to evidence sufficient[ ] to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case ." Id. (emphasis added).

In Fuentes, we held: "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." Id. (citations omitted). The complainant must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them`unworthy of credence,' and hence infer `that the employer did not act for [the asserted] non-discriminatory reasons.' " Id. at 765 (citing Ezold, 983 F.2d at 527).

"The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination." Furnco, 438 U.S. at 577. Where the plaintiff does offer evidence that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail. White v. Westinghouse Elec. Co., 862 F.2d 56, 62 (3d Cir. 1989) ("[i]n the context of a motion for summary judgment, the District Court cannot decide issues of fact").

Here, the District Court held:

when examining the "overall scenario" in the matter at hand, plaintiff has not presented evidence such that a factfinder could reasonably disbelieve defendant's articulated legitimate reasons or that an invidious discrimination reason was more likely than not a determinative cause of defendant's actions. In light of the objective evidence presented in the record, no reasonable factfinder could conclude that defendant's articulated reasons for not selecting plaintiff were pretextual. Consequently, defendant's motion for summary judgment will be granted. Dist. Ct. Op. at 19. However, based upon all the evidence we have already mentioned in our discussion of Iadimarco's prima facie case, we believe that this record clearly allows a reasonable fact finder to conclude that the proffered explanation was a pretext for race-based discrimination. See Fuentes, 32 F.3d at 764.

The District Court accepted Towler's explanation for hiring Williams. The court capsulized that explanation as follows:
" [Towler] did not believe that plaintiff was the right person for the job." Dist. Ct. Op. at 14. As we noted above,
Towler explained that Williams "seemed to be right for the plant at the time." Id. at 15. This was based upon Towler's purported belief that the position in question required someone with a human resources dynamic that Williams had, and Iadimarco lacked.

However, an employer can not successfully defend a hiring decision against a Title VII challenge merely by asserting that the responsible hiring official selected the man or woman who was "the right person for the job." The problematic nature of such an explanation is most easily seen in the context of discrimination against a minority or female applicant. Such an applicant may never be the "right person for the job" in the eyes of one who feels that the job can only be filled by a White male. The biased decision maker may sincerely believe that the White male who was offered the job was the right person, and minority and female candidates who were rejected were simply wrong for the job. The mere fact that one who discriminates harbors a sincere belief that he hired the "right person" can not masquerade as a race-neutral explanation for a challenged hiring decision. Such a belief, without more, is not a race-neutral explanation at all, and allowing it to suffice to rebut a prima facie case of discriminatory animus is tantamount to a judicial repeal of the very protections Congress intended under Title VII. Here Towler's professed belief that he hired Williams because she was "right for the job" can not, by itself, be accepted as an adequate race- neutral explanation for rejecting Iadimarco. Accordingly, the District Court erred in concluding that Iadimarco had not come forward with sufficient evidence to allow a factfinder to believe that the defendants' explanation of this personnel decision was pretextual.

III. Conclusion

For the reasons set forth herein, we hold that Iadimarco did establish a prima facie case of employment discrimination, and that there was a genuine issue of material fact as to whether the proffered explanation for

not hiring him was a pretext for illegal discrimination. Accordingly, we will reverse and remand for proceedings consistent with this opinion.

A True Copy: Teste:

Clerk of the United States Court of Appeals for the Third Circuit 26

FOOTNOTES