

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2007

# Mosca v. Cole

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4350

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Mosca v. Cole" (2007). *2007 Decisions.* Paper 1630.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1630

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.  05-4350

MICHAEL R. MOSCA,

Appellant

v.

AVIS COLE; BILLIE MOORE; LORENZO LANGFORD;
BENJAMIN R. FITZGERALD; CITY OF ATLANTIC
CITY; JOHN DOES 1-10, Jointly,
Severally and in the Alternative

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 03-cv-00168
District Judge: Honorable Joseph E. Irenas

Submitted under Third Circuit LAR 34.1 (a)
September 26, 2006

Before: RENDELL, CHAGARES, and ROTH, <u>Circuit Judges</u>

(Filed: February 14, 2007)

**O P I N I O N**

**ROTH,** Circuit Judge:

Michael Mosca sued his former employer, the City of Atlantic City, its Mayor, and other individuals for racial discrimination and other violations of federal and state law. The District Court granted partial judgment against Mosca on his federal claims and declined to exercise supplemental jurisdiction on the state claims. For the reasons set forth below, we will affirm the judgment of the District Court.

## I. Background and Procedural History

Because the parties are familiar with the facts and procedural posture, we will provide only a brief synopsis of the events leading up to this appeal.

From 1992 to February 2002, Mosca, a Caucasian attorney, was employed under a series of term contracts by the Municipal Prosecutor's Office of the City of Atlantic City.

In 1999-2000, while working as a prosecutor for the City, Mosca was involved in the prosecution of the Reverend Al Sharpton for acts of civil disobedience. The prosecution resulted in a ten-day sentence, of which Sharpton served only a few hours. Mosca claims that two African-American Atlantic City councilmen, defendant Lorenzo Langford and non-party Ernest Coursey, attempted to pressure him into dropping the case and apologizing for the prosecution, but Mosca refused to do so.

In November 2001, Langford was elected Mayor of Atlantic City and immediately began to plan the replacement of certain at-will municipal employees with individuals of his choice. In mid-December, he notified all four attorneys of the Municipal Prosecutor's Office, including Mosca, that they would be terminated on December 31, 2001 (the day

2

before Langford's swearing-in). Later, Mosca was told instead that his contract would not be renewed when it expired in February 2002.

Mosca spread the word that he wanted to continue working for the city, but nothing materialized until April of 2002, when a long-time social acquaintance, Stephen Smoger, took the position of City Solicitor. Smoger was short-staffed and believed Mosca's experience at the Municipal Prosecutor's office made him a good candidate for a part-time position as police liaison in the Solicitor's office. He approached Langford at a social event and proposed Mosca's appointment. Langford agreed but made clear that the decision could be reevaluated. Langford claims he considered Mosca's appointment a temporary measure and that he expected to hire a candidate of his choice later; Smoger recalls being told that he should stress to Mosca that he served at Langford's pleasure and would be reevaluated within the year.

According to Smoger, he then contacted Mosca and spoke to him about what he considered a significant obstacle to his hiring, namely the rapidly spreading rumor that Mosca had made a derogatory and possibly racist remark about Langford – reportedly that Langford was a "bow-tie-wearing, bean-pie-eating Muslim." Smoger recalls that Mosca denied he had made the remark, pointing out that he was married to a minority.

On May 13, 2002, Mosca, Smoger, and now-Deputy Mayor Coursey met in Smoger's office for Mosca's interview. According to Smoger and Coursey, Coursey raised the issue of the derogatory comment and Mosca denied making it. Mosca, in contrast, remembers being asked only about his political ties to the previous city administration. Eventually,

3

Coursey left the room, then returned and told Smoger he could hire Mosca. It is not clear whether Coursey consulted Langford during his absence or whether Langford knew of the rumor at this point.

Mosca started part-time employment in the Solicitor's Office two days later. His termination and new hiring were processed as a transfer so he could keep his benefits. Mosca was listed as an "Unclassified Employee" with no civil service protection; he understood that he served at the pleasure of the mayor and was subject to termination without cause.

Some time later, Langford apparently became interested in learning more about Mosca's alleged derogatory statement. Langford summoned Smoger, told him he had completed his investigation of the Mosca matter, and instructed him to terminate Mosca's employment. Smoger did so on June 10, 2002. Subsequently, an African-American attorney, Jackie Abdur Razzaq, was appointed to a full-time position in the Solicitor's Office, with duties different from the ones Mosca performed. Langford claims he had decided to terminate Mosca mainly to open up a position for a Caucasian campaign worker who, however, declined the appointment; he acknowledges that the rumor of the alleged statement was also a factor in his decision.

Mosca filed an action in state court against the City of Atlantic City, Langford, Fitzgerald (Langford's chief of staff), Avis Cole, Billie Moore, and ten "John Does." The action was removed to federal court, and Mosca filed an amended complaint alleging violation of equal protection, under 42 U.S.C. §1983; violation of procedural due process, under 42 U.S.C. § 1983; conspiracy, under 42 U.S.C. § 1983 and § 1985; racial

4

discrimination, under 42 U.S.C. § 1981; violation of Mosca's First Amendment rights; and "refusing or neglecting to prevent" (i.e., failure to train) under 42 U.S.C. § 1983, and a number of state law claims.

Upon the defendants' motion, the District Court granted summary judgment against Mosca on all the federal law claims and declined to exercise supplemental jurisdiction over the state claims. Mosca appealed.[1]

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction over this case under 28 U.S.C. §1331, with supplemental jurisdiction over Mosca's claims based on state law. We have jurisdiction to review the District Court's grant of partial summary judgment under 28 U.S.C. § 1291.

Our review of a grant of summary judgment is plenary. *Gottshall v. Consol. Rail Corp.*, 56 F.3d 530, 533 (3d Cir.1995). Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the non-moving party. *Gottshall*, 56 F.3d at 533. However, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence supporting its claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

---

[1] Mosca presents no argument about the dismissal of the conspiracy count (Count XI); thus, this opinion discusses only the claims of racial discrimination, procedural due process, equal protection, and failure to train.

## III. Analysis

On appeal, Mosca argues the District Court erred in finding he had not presented sufficient evidence to survive summary judgment on (1) a *prima facie* case of employment discrimination on the basis of race, (2) a violation of his First Amendment rights, (3) a *prima facie* case of denial of equal protection, and (4) failure to train in violation of 42 U.S.C. § 1983.

### A. Employment Discrimination

We apply a modified version of the familiar *McDonnell Douglas* burden-shifting analysis to claims of reverse discrimination in employment. *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination by presenting "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII." *Iadimarco*, 190 F.3d at 161. Once the plaintiff makes this showing, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its adverse action. *See id.* at 157. If the employer meets its burden of production by offering some evidence of a legitimate, non-discriminatory reason, the plaintiff can survive summary judgment by showing that the stated reason was a pretext. In order to show pretext, the plaintiff must point to "*some* evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." *Id.* at 166 (emphasis in original; internal citation and quotation marks omitted).

Mosca contends that he has made out a *prima facie* case of reverse racial discrimination because he was qualified for his position in the City Solicitor's Office, he suffered an adverse employment action by being terminated, and there was evidence from which a factfinder could believe that Mosca was treated differently because of his race, namely, an African American attorney (Razzaq) was hired to replace him even though she was less qualified and Mosca was terminated without a formal investigation.

Although there is very little evidence in the record that Razzaq interviewed for Mosca's position or in fact replaced Mosca, the District Court assumed for purposes of deciding the motion for summary judgment that she did. We will do the same.

Just as "the race of the selecting officials is not a sufficient circumstance to establish a prima facie case of discrimination by itself," *Iadimarco*, 190 F.3d at 156, the fact that a plaintiff's replacement is of a different race, without more, is not enough. Although Smoger, Mosca's Caucasian superior and long-time social acquaintance, believed Mosca to be a stronger addition to the office than Razzaq, the record contains no evidence that Razzaq was objectively less qualified than Mosca for a position in the Solicitor's Office, particularly in a situation where one of the required qualifications was enjoying the Mayor's trust. Mosca's own theory is that "Razzaq was not a mere African-American who happened upon a job in . . . Atlantic City, but rather, was an African-American with unquestionable [social] ties to Defendant Moore, who was alleged to have defamed Mosca." Under Mosca's own scenario,

7

Billie Moore and Avis Cole, two African-American attorneys, started a false rumor about Mosca to favor a friend. However, even if this were true, Mosca's employment discrimination claim would still fail.

Mosca also fails in his contention that the absence of a formal investigation into the alleged rumor shows his employer's tendency to treat Caucasians less well than others. Mosca grounds his allegation of discriminatory treatment on the fact that three city employees, two Caucasians and one African-American, had earlier been afforded more formal investigations. In the case of the two Caucasians, they were accused of harassment of their subordinate administrative staff; the African-American employee had been accused of calling a co-worker an "old lady." However, Mosca's alleged comment – a remark disrespectful to a superior, made outside the workplace to witnesses who were not, at the time, employed by the City – is not equivalent to the allegations of sexual harassment and other discrimination that he claims underwent formal investigations.

Even if Mosca could establish a prima facie case, the City has proffered legitimate, non-discriminatory reasons for his discharge, Langford's desire to create a position for a Caucasian campaign worker and Mosca's alleged derogatory comment. To defeat summary judgment, Mosca would have to point to some evidence from which a fact finder could reasonably either disbelieve the employer's articulated legitimate reasons, or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Iadimarco*, 190 F.3d at 165-66.

Mosca attempts to prove pretext by arguing that he did not make the alleged remark,

8

but this is immaterial. The question is whether the Mayor believed Mosca had made it. Mosca can point to nothing in the record that suggests otherwise. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001) ("it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus"). Mosca also does not attempt to rebut the City's contention that Langford intended to open a position for a campaign worker, who eventually declined the offer. There is no evidence that Mosca's replacement was motivated by anything other than Langford's desire to surround himself with people he trusted.

## B. Constitutional Violations Under 42 U.S.C. § 1983

"To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). For purposes of the motion for summary judgment, Langford and Fitzgerald do not dispute that they are persons acting under color of state law. The issue, then, is whether Mosca can establish that there is a genuine issue of fact as to whether they violated his constitutional rights. He cannot.

### 1. Procedural Due Process

Mosca contends that the City deprived him of a liberty interest without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States.[2]

---

[2] Mosca no longer argues that he had a property interest in his at-will employment.

He relies on our opinion in *Anderson v. City of Philadelphia*, 845 F.2d 1216, (3d Cir. 1988).

In *Anderson*, we wrote that

> an employment action implicates a fourteenth amendment liberty interest only if it (1) is based on a charge against the individual that might seriously damage his standing and associations in the community[,] for example, by implying that he had been guilty of dishonesty, or immorality, or (2) imposes on him a stigma of other disability that forecloses his freedom to take advantage of other employment opportunities. We have also held that to state a valid claim of a protected liberty interest, a plaintiff must plead that the allegedly stigmatizing information was 'published' or otherwise disseminated by his government employer to the public.

*Id.* at 1221-22 (citations, quotation marks, and alterations omitted). *See also Bishop v. Wood*, 426 U.S. 341, 348 (1976) (the discharge of a public employee whose position is terminable at the will of the employer does not violate the employee's liberty interests when there is no public disclosure of the reasons for the discharge).

Mosca contends Langford, Fitzgerald, and the City deprived him of the liberty interest described in *Anderson* by disseminating the information that he was terminated for making a version of the alleged comment that included the word "nigger." However, there is no evidence that Langford or Fitzgerald told anyone that Mosca was terminated for making the comment in any form, let alone one that apparently had not reached their ears at all. In fact, Mosca himself told a number of people about the alleged comment and stated to potential employers and eventually a newspaper that he believed it was the reason for his termination. Because there is no issue of fact as to whether Langford, Fitzgerald, or the City "published" the alleged remark, summary judgment was appropriate as to Mosca's due process claim.

10

## 2. Equal Protection

Mosca contends he was denied the benefit of the equal protection of the laws when he was "singled out for selective treatment" by being denied a formal investigation into the allegation that he had made a derogatory remark about the incoming Mayor.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr*, 473 U.S. 432, 439 (1985). Mosca's theory appears to be that regulations requiring the investigation of allegations of harassment or discrimination were selectively not applied to him.[3] He does not allege he is a member of a suspect class, but rather invokes the "class of one" theory announced in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*).[4] Under that theory, a plaintiff states a claim for violation of the Equal Protection clause when he "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. As this Court has recently noted, "at the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

---

[3] This is essentially a restatement in equal protection terms of Mosca's claim of denial of procedural due process.

[4] Mosca's own references are to *Levenstein v. Salafsky*, 164 F.3d 345, 352 (7th Cir. 1998).

Mosca's claim fails because he cannot identify a similarly situated individual who was treated differently. He points most forcefully to one Caucasian attorney who "was City Solicitor after Langford was elected and . . . received a thorough and complete investigation into allegations of sexual harassment made against him." Mosca was not accused of sexual harassment by a coworker; he was alleged to have made a derogatory comment about the incoming Mayor, outside the workplace, to individuals who were not at the time employed by the City. As the District Court correctly noted, "this hardly translates into [a] charge of workplace discrimination requiring some kind of fact-finding investigation." *Mosca v. Cole*, 384 F. Supp. 2d 757, 769 (D.N.J. 2005).[5]

### 3. First Amendment Right to Free Speech

Mosca argues the City, Langford and Fitzgerald retaliated against him for his 1999-2000 prosecution of Sharpton, which they opposed.

In order to establish that an employer retaliated against him for exercising his First Amendment right to free speech, a plaintiff must prove (1) that his speech was protected, (2) that he suffered an adverse employment action, and (3) that his protected speech was a substantial or motivating factor for the adverse employment action. *Swineford v. Snyder County Pennsylvania*, 15 F.3d 1258, 1270 (3d Cir. 1994). If the plaintiff meets this burden, the employer can still defeat the claim by establishing that it would have taken the same action even absent the plaintiff's exercise of free speech. *Id.*

---

[5] Langford, at whose pleasure Mosca served when he was terminated, appears to have taken whatever steps he believed sufficient to satisfy himself of the truth of the rumor.

12

Mosca can establish the first two elements of this claim but cannot produce sufficient evidence that his exercise of free speech was a cause of his termination. First of all, the prosecution of Sharpton occurred before he was hired into the Solicitor's office; he fails to explain why those who wanted to punish him for prosecuting Sharpton would not simply have refused to hire him to begin with. Second, there is no evidence that his involvement with the Sharpton prosecution played any role in his termination. Summary judgment was properly granted on this claim.

### 4. Failure To Train

Mosca argues the District Court erred in granting summary judgment on his *Monell* claim against the City based on its alleged failure to train Langford and Fitzgerald with regard to its anti-discrimination policies, thus allowing the alleged constitutional violations. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) (holding that there is no *respondeat superior* liability under § 1983, but municipalities can be held liable if officials act pursuant to policy or custom); *Berg v. County of Allegheny*, 219 F.3d 361 (3d Cir. 2000) (recognizing that a municipality's failure to train that results in a constitutional violation can establish a *Monell* claim).

Since Mosca has not established any constitutional violations, his *Monell* claim fails as a matter of course. The District Court committed no error.

## IV. Conclusion

For the reasons set forth above, we will affirm the judgment of the District Court.

13