Charles MESSINA, et al., Plaintiffs,

v.

E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.

No. CIV.A.02–1700–KAJ.

United States District Court, D. Delaware.

March 9, 2004.

Gary W. Aber, Esquire, Heiman, Aber, Goldlust & Baker, Wilmington, DE, for Plaintiffs.

Wendy K. Voss, Esquire, Potter Anderson & Corroon, LLP, Evelyn H. Brantley, Esquire, DuPont Legal, Wilmington, DE, for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

This is a reverse race discrimination case. Charles Messina is Caucasian. (D.I. 19 at ¶ 8.) Mr. Messina had worked as an electrician at E.I. du Pont de Nemours & Company, Inc. ("DuPont") for ap-

proximately 23 years when DuPont terminated his employment on October 17, 2000. (*Id.* at ¶ 9.) Barbara Messina is Mr. Messina's wife. Mr. and Mrs. Messina (collectively the "Plaintiffs") allege that DuPont engaged in reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, when DuPont terminated Mr. Messina's employment. (*Id.* at ¶ 20.) Presently before the court is a Motion for Summary Judgment (Docket Item ["D.I."] 75; the "Motion") filed by DuPont. The court has jurisdiction over this case pursuant to 42 U.S.C. § 2000e-(5)(f)(3) and 28 U.S.C. §§ 1331 and 1343. For the reasons set forth herein, DuPont's Motion will be granted.

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id.* at

255, 106 S.Ct. 2505; *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

## III. Background

Mr. Messina was hired by DuPont in May 1977 as an electrician. (D.I. 19 at ¶¶ 8–9.) At the time of his termination from employment in 2000, Mr. Messina was working for DuPont Facilities Services ("DFS"), also referred to as the "crafts organization," a business unit of DuPont, and was assigned to work at DuPont's research facility known as the "Experimental Station." (D.I. 76 at 3; D.I. 81 at 2.) Mr. Messina reported directly to Al Croce, a Caucasian, who in turn reported to Audrey Gidney, an African–American, who in turn reported to Christopher Heck, another Caucasian. (*Id.*)

In response to a 1999 incident that involved the violation of DFS's safety rules and policies by several DFS employees and outside contractors, DFS adopted three "Inviolable Safety Rules." (D.I. 77 at 4, A383–386.) These rules concerned: (1) lockout of hazardous energy sources;[1] (2) line break;[2] and (3) confined space entry.[3] (D.I. 76 at 4.) In January 2000,

---

1. The lockout procedures are governed by DuPont's Wilmington Area Safety Health Environment Manual (the "SHE Manual"). Procedures 8–9 of the SHE Manual require employees to lockout or isolate hazardous sources of energy prior to working on equipment, systems, or machines, or prior to working in an area where they could be exposed to the hazards controlled by the lockout. (D.I. 78 at A498.)

2. This rule requires employees who execute a "line break" to have completed formal line break training, to have a written and approved job plan, and to wear the necessary PPE. (D.I. 78 at A384.)

3. This rule requires employees who enter confined spaces to receive training, to complete the necessary documentation, and to receive supervisory approval. (D.I. 77 at A384.)

DFS conducted training regarding the Inviolable Safety Rules, and communicated to its entire organization that the Inviolable Safety Rules would be strictly enforced and that any future violations of these rules by DFS employees would result in termination of employment. (*Id.* at 4–5.)[4] Mr. Messina participated in this training and testified at his deposition that he received a copy of the Inviolable Safety Rules, that he was aware of DFS's intention to strictly enforce the rules, and that he knew that termination was a possible consequence of any future rule violations. (D.I. 76 at 4–5; D.I. 78 at A397.)

In or about May 2000, DFS instituted new procedures regarding written work plans, and provided training to all employees regarding the new requirements. (D.I. 76 at 7.) As part of the training, DFS provided employees with a "decision tree" to assist them in determining when a written plan would be required, and, with respect to electrical work, the decision-tree indicated that a written plan was required whenever work was to be performed on or near a source of electricity greater than 50 volts. (*Id.*) In June 2000, as part of the annual electrical safety training provided by DFS, Mr. Messina received training on the requirements for a written plan when performing electrically hazardous work. (*Id.* at 8.)

During the week of September 25, 2000, Mr. Messina was assigned to perform work on a 480–volt switch box (the "Box") located in the carpenter shop at the Experimental Station. (*Id.* at 8; D.I. 81 at 12.) The Box was plugged directly into an energized electrical circuit, and, regardless of whether the switch in the center of the box was in the "off" position,[5] the "line" side of the Box, the side that feeds the power into the box, was always energized. (*Id.*) The Box was labeled to indicate that flash hazard and shock hazard boundaries should be observed, and that work on or within 12 inches of the Box required level 2 personal protective equipment ("PPE").[6] (D.I. 76 at 8.) Because Mr. Messina's assignment was to be performed near an energized circuit of more than 50–volts, Mr. Messina was obligated under the Inviolable Rules and DFS procedures to have a written work plan approved by his supervisor and to shut down and lockout the electrical circuit involved. (*Id.* at 9.) He was also required by DFS procedures to wear level 2 PPE while performing the shutdown and voltage test on the Box to determine that the shutdown was effective. (*Id.*)[7] While performing this assignment, Mr. Messina complied with the shutdown

---

**4.** The Inviolable Safety Rules specifically state that any violator of the rules "could be subject to immediate termination." (D.I. 78 at A386.) Violations of safety rules, practices or policies is the first item listed in DFS's "Serious Acts of Misconduct" policy, and the policy states that termination from employment will be the "first consideration" for the commission of a "serious act of misconduct." (D.I. 76 at 5.) While Plaintiffs allege that the safety rules and procedures do "not require immediate termination" (D.I. 81 at 4), it is undisputed that the termination could be imposed as a consequence for failure to follow the safety rules and procedures. (*Id.*)

**5.** A switch located in the center of the Box controlled the flow of electricity to the "load" side of the Box. (D.I. 76 at 8.) When the switch in the Box was in the "off" position,

the "load" side of the Box was not energized. (*Id.*)

**6.** Level 2 PPE requires safety glasses, hard hat, minimum 6 ounce Nomex polycarbonate face shield, and heavy leather long gauntlet gloves. (D.I. 76 at 8.)

**7.** Procedures 1–6 of the SHE Manual require DFS employees to observe electrical arc flash hazard and shock hazard boundaries and to wear PPE appropriate to the level of hazard if for some reason a source of electrical energy cannot be shut down and locked out, or until the employee has confirmed through voltage testing that an electrical shut down or lockout was successful. (D.I. 76 at 6.) DuPont alleges that Mr. Messina was provided with both written instructions and received oral instructions on PPE during safety meetings while

and lockout requirements, as well as the PPE requirements. (*Id.*)

On October 3, 2000, Mr. Messina noticed that the cover on the Box that he had been working on the previous week was ajar. (D.I. 76 at 9; D.I. 81 at 12.) Without observing any of the safety rules or procedures that he had followed the week before, Mr. Messina attempted to push the cover back on, but when that effort was unsuccessful, he removed the cover of the Box and discovered that a wire had been pinched between the cover and the Box at the lower right hand corner of the Box. (*Id.*) This was the "load" side of the box that was not energized because the switch was turned off. (*Id.*) When Mr. Messina attempted to re-position the wires in the Box, an electric arc flash occurred because the line side of the box was energized, and Mr. Messina was burned. (D.I. 76 at 10; D.I. 19 at ¶ 10.) Mr. Messina was taken immediately to the hospital, where he stayed for four days. (*Id.*; D.I. 19 at ¶ 25.)

On the day of Mr. Messina's arc flash incident, DFS began an investigation of the events leading up to the arc flash, as well as the cause of the arc flash. (D.I. 76 at 10.) On October 10, 2000, the day Mr. Messina returned to work, DFS conducted a formal investigation meeting regarding the incident, which was attended by Mr. Messina, Mr. Croce, Ms. Gidney, Daniel Liggett, James Durkee, and Susan Dryden. (*Id.*) Based on its investigation, and its interview of Mr. Messina, DFS determined that Mr. Messina had acted in contravention of DFS's Inviolable Safety Rules by failing to shutdown and lockout the electrical circuit feeding the 480–Volt Box. (*Id.*)[8] DFS also determined that Mr. Messina had failed to follow DFS safety rules and procedures by not wearing the PPE specified for work on or near the Box, and by not preparing a written plan or receiving authorization for work on or near an energized electrical hazard. (*Id.* at 11.)[9]

Because Mr. Messina violated these rules, Ms. Gidney concluded that Mr. Messina should be terminated from employment. (*Id.*)[10] She inquired whether

employed by DFS, and, at his deposition, Mr. Messina stated that he was familiar with these procedures and was aware of the rules regarding PPE. (*Id.*)

8. Plaintiffs allege that Mr. Messina "did not believe he was doing electrical work when he was trying to maneuver the cover back on" because it was not his intention to work on the switch itself, but merely to fix the cover. (D.I. 81 at 13.) Plaintiffs further allege that Mr. Messina was working on the "load side" of the Box, which was not energized, and that he thought all of the components he was working on were de-energized. (*Id.*)

9. Plaintiffs allege that Mr. Messina did not think that he needed a written job plan because he did not think that he was doing electrical work, that Mr. Messina did not know the rules required a written plan, and, based on DFS rules and procedures, did not in fact need a written job plan. (D.I. 81 at 15–16.) Plaintiffs allege that an oral job plan was sufficient, but do not allege that Mr.

Messina even made an oral plan. (*Id.*) Plaintiffs also allege that Mr. Messina was not given OSHA training of the wearing of PPE (D.I. 19 at ¶ 26) and that Mr. Messina "thought that it was permissible to test a line for voltage without using PPE" (D.I. 81 at 17).

10. Plaintiffs appear to allege in their answering brief that Mr. Messina was discriminated against on the basis of race because of Ms. Gidney's purported racial animus. (D.I. 81 at 5–6, 14–15.) No such claim is made in the complaint. (D.I.19.) These unsupported and conclusory allegations are insufficient to defeat a claim for summary judgment. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment).

Mr. Messina's direct supervisor, Mr. Croce, concurred in this recommendation, and Mr. Croce informed Ms. Gidney that he agreed. (*Id.*) Since Ms. Gidney did not have the authority to hire or fire DFS employees, she sought approval from her supervisor, Mr. Heck. (*Id.*) At the direction of Mr. Heck, the recommendation was presented to the director of DFS and his executive staff for approval, or "non-objection." (*Id.*) No such objections were made, and on October 17, 2003, Mr. Messina's employment was terminated. (*Id.; see also* D.I. 19 at ¶¶ 13–14.)

After the arc flash incident in which Messina was burned, DuPont filed a worker's compensation claim on Mr. Messina's behalf with its insurance carrier, and the insurance carrier paid his medical expenses. (D.I. 76 at 12.) All of Mr. Messina's out-of-pocket expenses were reimbursed, and a special account at Mr. Messina's pharmacy was established to avoid out-of-pocket expenses to him. (*Id.*) Mr. Messina received wage replacement benefits for the period of October 18, 2000 through December 11, 2000. (*Id.*)

Plaintiffs filed a complaint against DuPont on December 30, 2002 (D.I.1) and amended the complaint on March 17, 2003 (D.I.19). In Count I of the amended complaint, Plaintiffs allege that DuPont has violated Title VII by treating Mr. Messina differently than similarly situated employees of a different race. (*Id.* at ¶ 19.) In Count II, Plaintiffs allege that DuPont violated 19 *Del. C.* § 2365 by terminating Mr. Messina in retaliation for seeking worker's compensation benefits. (*Id.* at ¶ 27.) In Count III, Plaintiffs allege that their marital relationship has been injured "in that each of them have been denied the comfort, society, and consortium of the other." (*Id.* at ¶ 29.) Plaintiff seeks reinstatement, compensatory damages, punitive damages, attorneys fees, and costs. (D.I.19.)

## IV. Discussion

Plaintiffs' reverse race discrimination claim under Title VII is based upon their "information and belief" that other employees who were not of the same race as Mr. Messina were not fired for committing safety violations similar to those committed by Mr. Messina. (D.I. 19 at ¶¶ 16–17.) Plaintiffs allege that "a determinative factor in the difference in discipline between that administered to [Mr. Messina] and that administered to other persons, not of the same race as [Mr. Messina], who have committed similar safety violations as [Mr. Messina], was a difference in race." (*Id.* at ¶ 18.) In support of these allegations, the Plaintiffs point to two incidents where African–American employees supposedly violated the same safety rules as Mr. Messina, yet were not fired.

The first incident occurred in December 1999 and led DFS to implement the Inviolable Safety Rules. On that occasion, an asbestos gasket at a flange joint in a pipe that provided steam and hot water to the Hotel DuPont needed to be removed and replaced. (D.I. 81 at 6.) Several DFS mechanics, including Arthur Tate, an African–American, and a contractor loosened the bolts and "spread the flanges" of the pipe so that asbestos workers, who were contractors, could replace the gasket. (*Id.* at 7–8.) In violation of DFS safety rules contained in the SHE Manual, the DFS employees did not lockout the valves controlling the flow of steam to the pipe. (*Id.*) DFS undertook an investigation of this "extremely serious safety violation," and the four Caucasian DFS employees that violated the lockout procedures were demoted and put on probation. (D.I. 76 at 15; D.I. 81 at 10.) Mr. Tate was not demoted and put on probation like the four Caucasian DFS employees because the final incident report stated that while Mr. Tate offered his assistance in the project,

he did not "actively perform work on the pipe." (D.I. 76 at 15.) Nevertheless, Mr. Tate was given an "informal contact," which is the first step in DuPont's discipline policy, for "failure to challenge the other workers for working without a lockout." (*Id.*) No action was taken against the contractors. (D.I. 76 at 17.)

The second incident occurred in or around January 30, 2001. (D.I. 81 at 17; D.I. 76 at 18.) Charles Mason, an African–American sheet metal mechanic who worked for DFS, was assigned to remove and repair or replace part of the venting system of an oven belonging to Central Research & Development ("CR & D "). (*Id.*) The DFS safety rules and procedures did not require a lock-out of the oven because Mr. Mason was "not working in the oven or on the oven," rather he was "working on a piece of sheet metal duct work removed from that oven." (D.I. 77 at A181.) Since "he was not exposed to [hazardous] energy of any type," he was not required to lockout the oven. (*Id.*) However, if Mr. Mason left the area, per CR & D procedures, "he was expected to notify CR & D staff of the need for a lockout … or otherwise ensure the oven would not be used." (D.I. 76 at 18.) A research scientist used the oven after Mr. Mason left the area, and smoke filled the work area. (*Id.; D.I. 81 at 17.*) Because Mr. Mason should have told the CR & D staff to lockout the oven before he left the area, it was concluded that Mr. Mason had failed to leave the work area in a safe condition. (*Id.*) He was given a "formal contact," which is the second step in DuPont's discipline policy. (*Id.*)

Title VII makes it an "unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court set forth a three-step burden shifting analysis for Title VII discrimination cases. First, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If that requirement is satisfied, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See id.* If the employer does so, the burden shifts back to the plaintiff to show the nondiscriminatory reason offered by the defendant-employer was a mere pretext for discrimination. *See id.*

■ The Third Circuit has extended the *McDonnell Douglas* burden shifting analysis to reverse discrimination cases. *See Iadimarco v. Runyon,* 190 F.3d 151, 158 (3d Cir.1999) (stating that the "language of *McDonnell Douglas* itself clearly establishes that the substance of the burden-shifting analysis applies with equal force to claims of 'reverse discrimination' "). However, since *McDonnell Douglas* requires the plaintiff in a discrimination case to show that he is a member of a minority group in order to establish his prima facie case, in *Iadimarco,* the Third Circuit stated that "all that should be required to establish a prima facie case in the context of 'reverse discrimination' is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." 190 F.3d at 161.

■ I hold that the Plaintiffs have not established a prima facie case of reverse race discrimination because the Plaintiffs have not presented sufficient evidence to support their allegations that the termi-

nation of Mr. Messina's employment at DFS was based upon a trait protected under Title VII. The Plaintiffs assert that Mr. Messina was disciplined more severely than Mr. Tate and Mr. Mason, both of whom are African–American. To show that employees are similarly situated, the plaintiff has the burden to show that they were "subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–618 (7th Cir.2000).

According to the Plaintiffs, Mr. Tate "was only given a verbal reprimand" for violating the same DFS safety rules and procedures that require lockout of hazardous energy sources prior to commencing work. (D.I. 81 at 24.) However, contrary to Plaintiffs allegations (*Id.*), Mr. Tate was not similarly situated to Mr. Messina. The incident that Mr. Tate was involved with occurred in December 1999, before DFS adopted the Inviolable Safety Rules, rules that constituted a "line in the sand" that future violations of these safety rules would not be tolerated. (D.I. 76 at 5; D.I. 84 at 3.) Mr. Messina's incident, on the other hand, occurred in October 2000, well after DFS adopted the rules and conducted training regarding them and after DFS adopted the more stringent requirements regarding written work plans. (D.I. 76 at 4.)

Because Mr. Tate was not subject to the Inviolable Safety Rules, or the more stringent work plan rules, he and Mr. Messina are not similarly situated. Therefore, Mr. Tate's less severe punishment for violating DFS safety rules and procedures is not sufficient to establish a prima facie case that DFS discriminated against Mr. Messina on the basis of race.

Similarly, the actions of Mr. Mason in regard to the oven incident in January 2001 are distinguishable from Mr. Messina's actions and establish that Mr. Mason was not "similarly situated" within the meaning of Title VII. Because Mr. Mason was working on a piece of sheet metal duct work that was removed from the oven, not in the oven or on the oven, the work that he was performing did not expose him or other workers to a hazardous energy source and did not pose a risk of serious injury to himself or others. (D.I. 76 at 18.) Therefore, Mr. Mason's failure to take specified precautions did not constitute a violation of DFS's Inviolable Safety Rules or any other specific DFS rule. (D.I. 76 at 31.) Contrary to the Plaintiffs' allegations, neither Procedures 8–9 of the SHE Manual nor the Inviolable Safety Rules apply where an employee is not performing work that exposes him or fellow employees to hazardous energy. (D.I. 84 at 16.) However, Mr. Mason was still disciplined for leaving the work area without notifying CR & D that his work was incomplete and that the oven should be locked-out per CR & D procedure. (*Id.*)

The Plaintiffs attempt to show that Mr. Mason violated the Inviolable Safety Rules by pointing to generalized statements in an affidavit and interrogatories that DFS employees are required to follow lockout procedures. (D.I. 81 at 30.) They do not address DFS's assertions that Mr. Mason was not involved with hazardous energy, and the Plaintiffs' broad generalizations that DFS safety procedures govern DFS employees do not outweigh the specific statements from DFS investigators that Mr. Mason did not violate the Inviolable Safety Rules in the January 2001 oven incident. (D.I. 84 at 16–18.) Because a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), Plaintiffs allegations that DFS discrimi-

nated against Mr. Messina because Mr. Mason was disciplined less severely for violating the Inviolable Safety Rules do not establish a prima facie case of race discrimination under *Iadimarco*.

Finally, Counts II and III of the Plaintiffs complaint will be dismissed. Plaintiffs have withdrawn their allegation that DuPont violated 19 *Del. C.* § 2365 by terminating Mr. Messina in retaliation for seeking worker's compensation benefits. (D.I. 81 at 1.) Plaintiffs also fail to mention or address DuPont's arguments in support of its motion for summary judgment on the loss of consortium. (D.I.81.) Therefore, DuPont is entitled to summary judgment on these claims.

## V. Conclusion

For the reasons set forth, DuPont's Motion (D.I.75) will be granted. An appropriate order will issue.

### ORDER

For the reasons set forth in the Memorandum Opinion issued on this date,

IT IS HEREBY ORDERED that DuPont's motion for summary judgment (D.I. 75) is GRANTED.