NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0107n.06

No. 22-3692

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 08, 2024

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| MATTHEW SMYER, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| KROGER LIMITED PARTNERSHIP I, et al., | ) | DISTRICT OF OHIO |
| Defendants-Appellees. | ) | |
| | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; BOGGS and READLER, Circuit Judges.

The court delivered a PER CURIAM opinion. BOGGS, J., (pp. 14–18), and READLER, J. (pp. 19–21), delivered separate concurring opinions.

PER CURIAM. This case involves a claim by Matthew Smyer, a white supervisor at several Kroger grocery stores, that he was discriminated against because of his race and sex. Kroger defended on the grounds that he had not shown that Kroger was "the unusual employer who discriminates against the majority" and because there were legitimate non-discriminatory reasons for the ills that he allegedly suffered. The district court ruled for Kroger, citing both grounds, and Smyer appeals. He also raises claims under the Family and Medical Leave Act (FMLA), which the district court correctly rejected below. We affirm.

I

A

Matthew Smyer, a white male who managed several Kroger stores near Dayton, Ohio, was assigned in May 2016 to Kroger's store in Wilmington, Ohio. Approximately one year later,

district manager Clint Rose—Smyer's direct supervisor—met with Smyer to discuss his performance. Employees at the Wilmington store had expressed their concerns about Smyer's management skills. Rose apparently agreed. He transferred Smyer to a smaller store on Bechtle Avenue in Springfield, Ohio, and warned Smyer that this position would be his "last chance" to prove himself as a manager.

Smyer's tenure in Springfield was fraught with problems. His assistant manager filed a complaint about Smyer's treatment of his employees. A corporate executive called the Bechtle Avenue meat department an "abomination." Several employees requested transfers away from Smyer's stores. Amid this continued turmoil, Rose again met with Smyer and repeated his warning that Smyer's status as a manager with Kroger was in jeopardy.

On October 15, 2019, a chicken fryer caught fire at the Bechtle Avenue store. Smyer was home at the time but learned from his assistant manager about the fire and the store's subsequent evacuation. When Eric Curtis—who had recently replaced Rose as Smyer's direct supervisor—called Smyer and asked if he was returning to the store, Smyer explained that he first had to finish mowing his lawn and attend to family obligations. Smyer would later explain that these obligations meant picking up his stepdaughter, whose medical condition keeps her from driving. Ten days after the fire, Smyer met with Duane Hatfield—the human-resources head of Kroger's Cincinnati and Dayton division—and two other HR representatives to discuss the fire and other issues with Smyer's performance. Hatfield transferred Smyer to the South Limestone Street store, an even smaller store than Kroger's Bechtle Avenue location. Smyer acknowledged in a disciplinary memo that this transfer was his "Last Chance and Final Warning," and that further violations of Kroger policy could result in his termination.

Kroger announced in January 2020 that it would close the South Limestone store. Smyer was instructed to prepare the store for closing by establishing clearance sections, cleaning shelves, and clearing the store's backroom. But when Curtis visited the store in February, he found that Smyer had neither completed these tasks nor communicated with his employees about them. Curtis issued Smyer a written warning that further incidents could lead to his termination.

Smyer disagreed with Curtis's evaluation. He claimed that Merle Hargis, a corporate employee who oversees Kroger's store closings, had visited the store and said that he "was very pleased with [its] performance" because Smyer and his team "were way beyond expectations." Upon learning of Smyer's comment, Hargis rejected it as "not a true statement." He explained that the shutdown tasks "should have been much further along or completed."

Over the next few weeks, HR representative Jessica Utterback repeatedly attempted to contact Smyer about other issues with the South Limestone store, but Smyer did not return her emails, texts, or phone calls. Utterback learned that Smyer had failed to complete various management tasks, including not posting employee vacation schedules on time and, despite her instructions, not completing a review of his assistant store manager. When Utterback visited the store on March 3, she found many shelves empty.

On March 4, Hatfield, Curtis, and Utterback agreed to terminate Smyer. Curtis and Utterback met with Smyer that afternoon to give him the chance to resign. Although the parties dispute what happened near the end of this meeting, they agree that Smyer asked Curtis to stop yelling at him and that Smyer said that he feared Curtis. Smyer did not resign.

Two days later, Hatfield, Curtis, and Utterback again met with Smyer to discuss his performance. After Curtis and Utterback left the room at Smyer's request, Smyer asked Hatfield for a referral to a counselor, citing emotional distress from his earlier confrontation with Curtis.

This request did not sway Hatfield's decision on Smyer's employment status. On March 11, Hatfield fired Smyer.

B

Smyer then commenced this action against Kroger in the United States District Court for the Southern District of Ohio, alleging interference and retaliation under the FMLA, 29 U.S.C. § 2615(a)(1)–(2); "reverse" race discrimination and "reverse" sex discrimination,[1] in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a); discrimination for a perceived disability, in violation of Ohio Rev. Code § 4112.02(A); and claims brought under various Ohio common-law tort and contract causes of action. The parties filed cross-motions for summary judgment.

The district court granted summary judgment to Kroger and denied summary judgment to Smyer. The court rejected Smyer's claim of reverse race discrimination, holding that Smyer was not similarly situated to his chosen comparators—six Black store managers who were terminated as part of a Kroger reorganization but offered more generous severance packages. The court likewise rejected Smyer's claim of reverse sex discrimination, holding again that Smyer was not similarly situated to his chosen comparators—here, six female employees offered store-manager positions around the time that Smyer was fired—as to whose qualifications or disciplinary history Smyer had provided no information.

---

[1] Smyer uses the term "reverse" discrimination, so we will follow his usage, though Title VII has no such qualifier. All claims of race and sex discrimination are actionable under its terms. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–79 (1976) ("[Title VII's] terms are not limited to discrimination against members of any particular race."). As Justice Marshall wrote for a unanimous Court, Title VII "proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *Id.* at 280. Simply put, "[t]he Act prohibits All racial discrimination in employment, without exception for any group of particular employees." *Id.* at 283.

The court also rejected Smyer's FMLA interference and retaliation claims, finding no evidence that those involved in Smyer's termination knew, or should have known, that Smyer had requested FMLA leave on various occasions over the last few months to care for his stepdaughter. The court added that, even if Smyer's supervisors were on notice that Smyer had taken FMLA leave, Smyer could not show that Kroger's reason for firing him—his poor performance as store manager—was pretextual. The district court also dismissed Smyer's claim that he was fired because of a perceived mental disability. The court noted that Hatfield had decided to fire Smyer before learning that Smyer had sought mental-health treatment. Finally, the court dismissed Smyer's remaining state-law claims without prejudice. It declined to exercise supplemental jurisdiction for these claims after dismissing all of Smyer's federal claims over which it had original jurisdiction.

Smyer timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II

We review de novo a district court's decision on summary judgment. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). "When reviewing cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). "The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party shows that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III

The traditional *McDonnell Douglas* framework for stating a prima facie case of race discrimination requires a plaintiff to establish, absent direct evidence of discriminatory intent, that: (1) he is a member of a protected class; (2) he was qualified for a promotion; (3) he was considered for and denied that promotion; and (4) other candidates with similar qualifications who were not members of the protected class received promotions when the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Our circuit has modified this framework for reverse-discrimination claims filed by members of a demographic majority. In that circumstance, the plaintiff may only rely on the *McDonnell Douglas* scheme to prove a prima facie case of discrimination if he can show that his employer "is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)).

We start with Smyer's claim of reverse race discrimination. For that claim to proceed, Smyer must provide some evidence that he was treated worse than comparable persons of a different race. *See, e.g.*, *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). He failed to do so. Smyer argues that Kroger treated him less favorably under its severance policy than similarly situated Black store managers. He asserts that, of the twenty store managers in Smyer's division who were offered severance packages around the time of Smyer's termination, six were Black and received severance packages more favorable than Kroger's two-month offer in

his case. But the record does not support these allegations. The six Black managers received severance packages under Kroger's Reorganization Severance Plan, for which Smyer was not eligible upon termination because he was fired for cause. Smyer claims that three of these managers were fired for cause but offers no evidence except his own affidavit. On the contrary, the record is clear that these managers were not fired for cause.

In addition, Kroger presented legitimate non-discriminatory reasons for its decision to terminate Smyer. Kroger claims that it terminated Smyer for poor performance, poor leadership, and insubordination. The district court's analysis on that point was wholly correct. The record is replete with examples of Smyer's performance issues.

Nonetheless, Smyer argues that Kroger's explanation is pretextual. To demonstrate pretext, Smyer must show that these legitimate reasons (1) have no basis in fact, (2) did not actually motivate Kroger's action, or (3) were insufficient to warrant Kroger's action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 612 (6th Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Smyer contends that Kroger terminated Smyer not for his "long history of performance problems," but for his performance during the five months between the chicken-fryer fire and his termination. Even if Smyer's theory were correct, his performance at the South Limestone store does not undermine Kroger's explanation for his termination. Curtis issued Smyer a warning notice for his failure to complete shutdown tasks at the store. Hargis confirmed Smyer's lack of progress on those tasks. Utterback's subsequent visits revealed further instances of Smyer's poor leadership and insubordination. Smyer claims that Kroger has offered inconsistent explanations for his termination, but the record charts a steady series of performance problems throughout Smyer's tenure as a manager. Smyer has not shown pretext.

For similar reasons, Smyer's claim of reverse sex discrimination also fails. He claims that Kroger promoted several less-experienced women to store managers around the time that it terminated Smyer. Smyer was not eligible for a promotion or transfer because of his disciplinary history. Although Smyer concedes that he has no evidence about the women's job performance or disciplinary history, he stresses that Hatfield also knew nothing about the women when he promoted them. Regardless of what Hatfield may have known about Smyer's chosen comparators, Smyer has not presented evidence of a store manager with a performance record as poor as his. Without any evidence of his comparators' disciplinary history or performance, Smyer fails to establish that these women were similarly situated to him. *See, e.g.*, *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009).

IV

We next turn to Smyer's FMLA claims. Smyer attempts to show that Kroger violated his FMLA rights under two theories: interference and retaliation. *See Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 475 (6th Cir. 2019). The interference theory, which arises under 29 U.S.C. § 2615(a)(1), prohibits Kroger from "interfer[ing] with or deny[ing]" Smyer's exercise of his FMLA rights. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The retaliation theory, which arises under 29 U.S.C. § 2615(a)(2), bars Kroger from "discharging or discriminating" against Smyer "for 'opposing any practice made unlawful by'" the FMLA. *Ibid.* (quoting *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003)).

Absent direct evidence of interference or retaliation, Smyer must prove either FMLA theory under the *McDonnell Douglas* framework. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427, 432–33 (6th Cir. 2014); *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 840, 842 (6th Cir. 2012). To establish a prima facie case of FMLA interference, Smyer

must show that (1) he was an eligible employee; (2) Kroger meets the FMLA's definition of "employer"; (3) he was entitled to FMLA leave; (4) he gave Kroger notice of his intention to take FMLA leave; and (5) Kroger denied Smyer the FMLA benefits to which he was entitled. *Dyer*, 934 F.3d at 475. For his retaliation claim, Smyer must show that (1) he was engaged in an activity protected by the FMLA; (2) Kroger knew that he was exercising his FMLA rights; (3) Kroger, after learning that Smyer was exercising these rights, took an adverse employment action; and (4) there was a causal connection between that adverse action and the protected FMLA activity. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). If Smyer establishes his prima facie case, the burden shifts to Kroger to show that it had "a legitimate, nondiscriminatory reason" for firing Smyer. *Ibid.* If Kroger satisfies this burden, the burden shifts back to Smyer to rebut Kroger's reason as pretextual. *Id.* at 761–62.

The parties dispute only whether the supervisors involved in Smyer's termination—Eric Curtis, Duane Hatfield, and Jessica Utterback—knew, or were on notice, that Smyer had asserted his FMLA rights. Smyer need not expressly mention the FMLA when requesting leave. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). However, "[t]he FMLA does not require an employer to be clairvoyant." *Id.* at 428. Smyer must provide Kroger "enough information . . . to know that an FMLA qualifying event has occurred." *Hrdlicka*, 63 F.4th at 573.

Smyer identifies three instances when he contends that he adequately notified his supervisors that he was taking FMLA leave to drive his stepdaughter from school or to a medical procedure: (1) during the October 25, 2019, meeting about the chicken-fryer fire that took place on October 15; (2) on November 27, 2019, when he asked Curtis for a day off; and (3) on February 12, 2020, when he asked Curtis for another day off.

The record does not support that these instances constituted adequate notice. Notes taken during the October 25, 2019, meeting indicate that Smyer never told Hatfield that he was using FMLA leave to pick up his stepdaughter during the fire incident. They suggest only that Smyer mentioned "family obligations," and that he "had to pick [his] daughter up." When Hatfield asked Smyer whether he could have arranged alternative transportation for his stepdaughter instead of picking her up, Smyer acknowledged the point instead of explaining that his stepdaughter's condition prevents her from driving or that he had approval to take FMLA leave. Smyer's account of this meeting, to the extent that it has been consistent, rests only on his own pleadings. It is not supported by his testimony and conflicts with the picture painted by two sets of contemporaneous meeting notes and testimony from the three other people in the meeting. No reasonable jury could conclude that Smyer told Hatfield at this meeting that he was taking FMLA leave.

Smyer attempts to show notice through affidavits from himself and district manager Clint Rose. Smyer does not challenge—and therefore forfeits any objection to—the district court's decision to deny Smyer leave to file a revised memorandum in opposition to Kroger's motion for summary judgment, to which his affidavit was attached. *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). Meanwhile, Rose's affidavit, in which Rose states that he was aware that Smyer "had [been] approved [for] intermittent FMLA leave," proves only that Kroger had institutional knowledge of Smyer's FMLA status. *See Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 480 (6th Cir. 2018). Smyer does not otherwise show that Rose told Smyer's supervisors about Smyer's FMLA status before they terminated him—or that Smyer ever put his supervisors on notice of a specific FMLA event. Nor has Smyer shown that Curtis or Utterback knew of his FMLA status. His suggestion that the panel can infer knowledge through "discriminatory information flow" fails because Smyer has not shown that Curtis or Utterback knew that he had

ever taken FMLA leave. *See Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008).

Smyer similarly offers no evidence other than his own deposition testimony to show that he requested FMLA leave from Curtis on the two days in November 2019 and February 2020. Smyer claims that the first exchange with Curtis happened via email, but he never produced the emails. On the second occasion, Smyer claims that he requested leave in front of witnesses, but he did not ask any of them during their depositions if they remembered this conversation. Since Curtis denies knowing of Smyer's FMLA status, Smyer cannot "offer[] only conspiratorial theories . . . [or] flights of fancy, speculations, hunches, intuitions, or rumors." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). On appeal, Smyer points to Hatfield's concession that these exchanges, as Smyer described them during his deposition, would amount to sufficient notice. But Hatfield's answers to Smyer's hypotheticals have no bearing on what Smyer told Curtis, or on whether he otherwise gave adequate notice.

Smyer argues that *Render v. FCA US, LLC*, 53 F.4th 905 (6th Cir. 2022), controls his FMLA claims, but that case is easily distinguished. There, we reversed a grant of summary judgment against an employee's FMLA claims, holding that he had given his employer adequate notice of his leave request. *Id.* at 919, 921. But the decisionmaker in *Render* admitted to knowing that the employee had claimed FMLA leave before she terminated him. *Id.* at 921. Here, all of Smyer's supervisors denied knowing that Smyer had requested FMLA leave before they terminated him. And to the extent that "[r]eferencing symptoms and language that is used in an employee's medical certification forms would be sufficient" notice for Smyer's interference claim, *id.* at 917, Smyer has not met his burden to show evidence that he actually referenced the need to care for his stepdaughter in any of his alleged requests for leave, *see Alexander v. CareSource*,

576 F.3d 551, 558 (6th Cir. 2009). No reasonable jury could conclude that Smyer at any point provided adequate notice of his need for FMLA leave.

V

Finally, we turn to Smyer's claim, arising under Ohio law, that he was fired because of a perceived mental disability. Because Ohio's antidiscrimination statute tracks the Americans with Disabilities Act (ADA), we consider Smyer's state-law claim under our ADA caselaw. *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n.3 (6th Cir. 2008). To establish a prima facie case of disability discrimination, Smyer must show that he: (1) is disabled; (2) is otherwise qualified to perform the essential functions of his job; and (3) suffered an adverse employment action because of his disability. *Demyanovich*, 747 F.3d at 433 (citing *Talley*, 542 F.3d at 1105). For a perceived-disability discrimination claim, Smyer need only show that Kroger believed that he was disabled. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019).

Smyer claims that Hatfield fired him because he believed that Smyer had a mental disability. Smyer argues that Hatfield decided to terminate him days after learning that Smyer sought mental-health treatment. However, Hatfield decided to terminate Smyer on March 4, 2020, before Smyer ever requested a referral to a counselor. Nothing Smyer said in his March 6 meeting with Hatfield would have changed Hatfield's mind. Smyer notes that when he complained to Hatfield of Curtis's behavior during an earlier meeting, Hatfield said that he "was at a loss at what to do." That Hatfield may not have known how best to handle this exchange between Smyer and Curtis does not suggest that he was undecided about firing Smyer. Nor does the timing of Smyer's termination on March 11, after he first met with a Kroger-sponsored counselor, undercut the conclusion that a termination decision had already been made. No reasonable jury could find that Hatfield fired Smyer because he believed that Smyer was disabled.

VI

Smyer also challenges the district court's decision not to exercise supplemental jurisdiction over his state-law claims. We review such a decision for abuse of discretion. *Southard v. Newcomb Oil Co., LLC*, 7 F.4th 451, 455 (6th Cir. 2021). A district court can exercise supplemental jurisdiction "over all other claims that . . . form part of the same case or controversy" as the claim over which they have original jurisdiction, 28 U.S.C. § 1367(a), but doing so is discretionary, *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). "Once a federal court no longer has federal claims to resolve, it 'should not ordinarily reach the plaintiff's state-law claims.'" *Southard*, 7 F.4th at 455 (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)). Had the district court maintained supplemental jurisdiction, it would have resolved only the claims arising under Ohio law. The court did not abuse its discretion in declining to do so. Smyer's arguments on the merits of these claims do not upset this conclusion. Nor does his assertion that the district court erred in dismissing Smyer's federal claims.

VII

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

BOGGS, Circuit Judge, concurring. I write separately to emphasize that *Murray v. Thistledown Racing Club*, 770 F.2d 63 (6th Cir. 1985), should be overruled. By requiring a "majority" plaintiff to show that his employer "is that unusual employer who discriminates against the majority," *id.* at 67, *Thistledown* engages in the very discrimination that it intended to prohibit. And regardless of whether the case was ever correct, it has now been significantly undermined by the Supreme Court's decision in *Students for Fair Admissions v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). The impact of this intervening authority was not raised in this case, but in a case where it is raised, it should be the final nail in *Thistledown*'s coffin.

Although some courts agree with *Thistledown* and apply the unusual-employer requirement, *see, e.g.*, *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017–18 (D.C. Cir. 1981), others disagree, *see, e.g.*, *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.15 (11th Cir. 2011).[1] In particular, as then-Judge (later Chief Judge) McKee explained, the unusual-employer requirement is "irremediably vague and ill-defined." *Iadimarco*, 190 F.3d at 161. "Such a requirement does raise the bar for the prospective 'reverse discrimination' plaintiff, notwithstanding the denial of this limitation" by courts that have adopted the rule. *Id.* at 162. And that higher bar, *Iadimarco* concluded, could not be squared with Title VII's core inquiry of "whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Id.* at 160 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

---

[1] My colleague Judge Kethledge has helpfully summarized this circuit split. *See Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 827–28 (6th Cir. 2023) (Kethledge, J., concurring) (collecting cases). Five circuits have added this additional element, two have explicitly rejected it, and five simply do not apply it. *Ibid.* It appears that the Federal Circuit is the only circuit not to opine on the issue.

In *Thistledown*, we reasoned that this additional showing was necessary to determine whether discrimination against a member of the majority had, in fact, occurred. *See* 770 F.2d at 67 (requiring plaintiff to show he was intentionally discriminated against "despite his majority status"). But since 1985, the basis for *Thistledown* has become problematic. The very question of who should be considered part of the "majority" is increasingly contested. *See* David E. Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171, 196–209 (2021); *Students for Fair Admissions*, 600 U.S. at 290–94 (Gorsuch, J., concurring). In addition, a wide variety of programs, especially in education, reveal that it is not at all unusual for major segments of society to base their actions on a person's membership in certain demographic groups, often to the detriment of the "majority" and certain "minority" persons sometimes deemed to be "majority-adjacent." The Supreme Court recently confronted this very issue in *Students for Fair Admissions*, holding that the admissions policies at Harvard College and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment. 600 U.S. at 230–31. In that case, self-proclaimed "Major American Business Enterprises"[2] filed a vehement amicus brief in support of that very discrimination. *See* Brief of Amici Curiae Supporting Respondents at 20–21, 600 U.S. 181 (2023) ("Prohibiting universities nationwide from considering race among other factors in composing student bodies would undermine businesses' efforts to build diverse workforces."); *see also* Brief for the American Bar Association as Amicus Curiae in Support of Respondents, 600 U.S. 181 (2023); Brief for Amici Curiae Association of American Medical Colleges et al. in Support of Respondents, 600 U.S. 181 (2023). These are difficult and more recent developments.

---

[2] Indeed, the signers of the brief included such corporations—taken at random and listed alphabetically—as American Express, Apple, Dell Technologies, General Electric, General Motors, Google, Merck & Co, Northrop Grumman, Procter & Gamble, United Airlines, and Walgreens. *See* Brief of Amici Curiae Supporting Respondents at app. A, 600 U.S. 181 (2023).

But *Thistledown* itself is the only reason that we must confront them when attempting to resolve a reverse-discrimination claim. With no reference to statutory text, *Thistledown* distinguished plaintiffs based on their membership in certain demographic groups. In a world where it has become increasingly difficult to determine who belongs in the majority, it is more apparent than ever that *Thistledown* and its progeny have led our court's Title VII jurisprudence astray.

Even a simple textual interpretation of the Civil Rights Act shows *Thistledown*'s error, as my colleague Judge Kethledge has persuasively pointed out. *See Ames*, 87 F.4th at 827 (Kethledge, J., concurring). Title VII of the Act prohibits employment discrimination against "any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). This provision is not ambiguous: "any individual" means *any* individual, regardless of his or her demographic characteristics. It does not matter whether an individual possesses certain characteristics of race, color, religion, sex, or national origin. All people are equally entitled to be free from employment discrimination on those bases. It would be odd—contrary, even, to Title VII's important purpose of ensuring "that the workplace be an environment free of discrimination," *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009)—to subject a plaintiff to a more demanding burden simply based on his membership in a certain demographic group. To conclude otherwise would be to discriminate on "the very grounds that the statute forbids." *Ames*, 87 F.4th at 827 (Kethledge, J., concurring). And yet that is what *Thistledown* requires us to do.

*Students for Fair Admissions* significantly undermined this requirement. The case's impact was not raised here. But in a case where the issue is adequately briefed, there are strong reasons to conclude that a future panel should overrule *Thistledown*. In most cases, a panel cannot reconsider or alter circuit precedent without an en banc hearing. But when an intervening Supreme Court decision undermines our circuit precedent, we have the right—and the responsibility—to

revisit our prior holdings. *See, e.g.*, *United States v. Woods*, 61 F.4th 471, 480 (6th Cir. 2023); *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 829 (6th Cir. 2021); *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016); *Sierra Club v. Korleski*, 681 F.3d 342, 351–52 (6th Cir. 2012); *Barr v. Lafon*, 538 F.3d 554, 570–71 (6th Cir. 2008). This is true "even when the intervening Supreme Court decision is not precisely on point but provides directly applicable legal reasoning, or when it provides on-point dictum." *United States v. Fields*, 53 F.4th 1027, 1047 (6th Cir. 2022) (cleaned up); *see also In re Baker*, 791 F.3d 677, 682–83 (6th Cir. 2015); *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518–19 (6th Cir. 2006); *Prod. Solutions Int'l, Inc. v. Aldez Containers, LLC*, 46 F.4th 454, 458 (6th Cir. 2022). To the extent that our circuit precedent conflicts with intervening Supreme Court authority, it is no longer controlling. *See United States v. Butts*, 40 F.4th 766, 769 n.3 (6th Cir. 2022).

*Students for Fair Admissions* is such an intervening authority. *Thistledown*'s key premise was that discrimination against the majority was unusual and that to tease it out requires additional evidence. But *Students for Fair Admissions* shows that it is not unusual at all for powerful interests in the United States to indeed discriminate against the "majority." The Court repeatedly, and in no uncertain terms, characterized the universities' admissions practices as impermissible discrimination. *See, e.g.*, 600 U.S. at 205–11, 214; *see also id.* at 232 (Thomas, J., concurring) ("Two discriminatory wrongs cannot make a right."); *id.* at 288 (Gorsuch, J., concurring) ("[T]he trial records reveal that both schools routinely discriminate on the basis of race when choosing new students . . . ."). This reasoning plainly confirms that, contrary to *Thistledown*, discrimination against the "majority" occurs in ways and places that are not at all "unusual." It matters little that *Students for Fair Admissions* discussed this discrimination in the context of the Fourteenth Amendment—"'[b]oth Title VI and Title VII' codify a categorical rule of 'individual equality,

without regard to race.'" *Id.* at 290 (Gorsuch, J., concurring) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 416 n.19 (1978) (Stevens, J., concurring in judgment in part and dissenting in part)). Especially after *Students for Fair Admissions*, we cannot allow our precedent in *Thistledown* to resist the inevitable conclusion that "[e]liminating racial discrimination means eliminating all of it." *Id.* at 206.

All individuals who believe that they have been victims of any form of employment discrimination based on race, color, religion, sex, or national origin are entitled, on equal footing, to the protections afforded by Title VII. To accord our law with this core principle made explicit in *Students for Fair Admissions*, we should not apply *Thistledown*. Instead, we should use the conventional *McDonnell Douglas* framework to determine what a plaintiff—any plaintiff—is required to show to make a prima facie case of employment discrimination, just as seven of our sister circuits do. *See Iadimarco*, 190 F.3d at 157–63; *Smith*, 644 F.3d at 1325 n.15; *Williams v. Raytheon Co.*, 220 F.3d 16, 18–19 (1st Cir. 2000); *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80–81 & n.5 (2d Cir. 2009); *Lightner v. City of Wilmington*, 545 F.3d 260, 264–65 (4th Cir. 2008); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010).

CHAD A. READLER, Circuit Judge, concurring.  I share Judge Boggs's dim view of *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir. 1985).  *See supra* at 14 (Boggs, J., concurring).  It is no understatement to say, as a nation, that we do not all see eye to eye on issues of race, sex, religion, and the like.  American history is replete with examples.  As history has also made clear, harmonizing those differences is no easy task.  Not for society.  Not for lawmakers.  And, I would add, not for the courts, as *Thistledown* reflects.  Judge Kethledge brought the decision's deep flaws to light in his concurring opinion in *Ames v. Ohio Department of Youth Services*, 87 F.4th 822, 827 (6th Cir. 2023) (Kethledge, J., concurring) (noting that "Title VII of the Civil Rights Act of 1964 bars employment discrimination against 'any individual'" but "our interpretation treats some 'individuals' worse than others" (citing, inter alia, *Thistledown*)).  *Thistledown* was likely a good faith effort to address societal concerns perceived by the Court.  But as Judge Boggs explains, as a textual matter, *Thistledown* was wrong the moment it was decided.  Time has only confirmed that conclusion.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 204–08, 214 (2023); *supra* at 14–16 (Boggs, J., concurring).

Last year, *Students for Fair Admissions* struck down race-based admissions policies that purported to preference "minority" applicants.  *Students for Fair Admissions*, 600 U.S. at 218–19, 230.  The Supreme Court's command was unambiguous:  "race may never be used as a 'negative.'"  *Id.* at 218.  As a result, admissions policies that "favor[ed] certain candidates over others based on the color of their skin" ran afoul of the law.  *Id.* at 301 (Thomas, J., concurring).  That was true as a constitutional matter—in the case of the University of North Carolina, the practice violated the Equal Protection Clause of the Fourteenth Amendment.  *Id.* at 230 (majority opinion).  And it was

also true as a statutory matter—in the case of Harvard University, the practice violated Title VI of the Civil Rights Act of 1964. *Id.* at 198 n.2, 230.

That latter holding, which "restored the plain text of Title VI," bears emphasis here. *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 508 (5th Cir. 2023) (en banc) (Ho, J., concurring). True, today's case is pursued under Title VII, not Title VI. But the two hold much in common. Congress enacted Title VI and Title VII simultaneously in the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241. And each is a reflection of the other. With respect to a "program or activity receiving Federal financial assistance," Title VI mandates that "[n]o person in the United States shall, on the ground of race, color, or national origin, . . . be subjected to discrimination." 42 U.S.C. § 2000d. "Just next door," Justice Gorsuch observed in *Students for Fair Admissions*, "Congress made it 'unlawful . . . for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin.'" 600 U.S. at 290 (Gorsuch, J., concurring) (quoting 42 U.S.C. § 2000e-2(a)(1)). To his eye, the relevant text is "essentially identical." *Id.* To our eye as well, we recently noted. *See L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (citing Justice Gorsuch's concurrence in *Students for Fair Admissions* for the proposition that "Title VI and Title VII's terms are 'essentially identical'").

It follows that *Students for Fair Admissions*'s reading of Title VI is powerful evidence of the meaning of Title VII. As an interpretive matter, "when Congress uses the same terms in the same statute, we should presume they 'have the same meaning'" *Students for Fair Admissions*, 600 U.S. at 290 (Gorsuch, J., concurring) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)). That adage rings especially true here, where "'both Title VI and Title VII' codify a categorical rule of 'individual equality, without regard to race.'" *Id.* (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 416 n.19 (1978) (Stevens, J., concurring in the judgment and dissenting in part))

(cleaned up). In the end, with *Students for Fair Admissions* seemingly prohibiting all forms of discrimination identified by Title VI, whether the victim is a member of a purported majority group or minority group, the same rule should apply to cases brought under Title VII, contrary to *Thistledown*.

As Judge Boggs emphasizes, however, we were not asked to consider *Students for Fair Admissions*'s effect on *Thistledown* and our Title VII jurisprudence. Nor, it appears, was there any mention of the issue in *Ames*. So whether *Thistledown* has continued viability after *Students for Fair Admissions* remains an open question in our circuit. But it is one ripe for consideration. And the holding there, informed by text and history, strongly suggests that *Thistledown*'s days are numbered.